[No. C. D. 1366. *En Banc.* December 11, 1930.]

*In the Matter of the Proceedings for the Disbarment of* THEODORE B. BRUENER.[1]

*The Attorney General,* and *L. B. Donley,* for the state.

*M. F. Gose, George H. Rummens,* and *Maurice A. Langhorne (Hayden, Langhorne & Metzger,* of counsel) for accused.

MILLARD, J.—This is a disbarment proceeding. Respondent was charged with unethical conduct in that he spent an entire afternoon in the company of a woman juror for the purpose of influencing the action of that juror in a cause in favor of respondent's client. The facts as found by the state board of law examiners are as follows:

For the purpose of condemning the water plant owned by the defendant and to have a valuation fixed thereon so that the plaintiff city might acquire it, an action was instituted by the city of Hoquiam against the Oregon-Washington Water Service Corporation. Trial of the cause to the court and a jury was commenced June 10, 1929, in the Grays Harbor county

[1]Reported in 294 Pac. 254.

superior court at Montesano. The defendant water corporation was represented by a number of attorneys, of which respondent was one. One of the jurors was a Mrs. Katherine Law, who resided with her husband a short distance from the court house. The jurors were allowed to separate during the trial. On July 11, the attorneys for the plaintiff city employed two profes-sional investigators or detectives to investigate a course of conduct which had been observed going on between Mrs. Law and an engineer employed by the defendant. The investigators observed the jurors at recess and after court hours, particularly Mrs. Law, and on one occasion that juror, on her way to the court house, stopped and had a short conversation with a reputed bootlegger, who accompanied that lady in his automobile to the court house. About July 18 or 19, she was in the company of this man, who escorted her to a dance. During the period commencing with the trial and July 20, it was observed that Mrs. Law seemed to pay considerable attention to an engineer employed by the defendant company, and the two exchanged glances and smiles.

On a few occasions, the respondent was observed drinking at a fountain at the same time Mrs. Law was there, and they exchanged a few words, but nothing out of the ordinary was observed nor was anything observed passing between the respondent and Mrs. Law in the court room. On another occasion it was observed that the cars of respondent and Mrs. Law were parked side by side; that he left the court house just ahead of her and, as they arrived at the cars, the respondent stopped and said something to her. This was several days prior to July 20. As July 20 fell on Saturday, the court adjourned at noon. Some time during the forenoon of that day, Mrs. Law telephoned to the operator of a confectionery and lunch counter

506

to prepare a lunch for two people, the lunch consisting of chicken sandwiches and two pieces of apple pie. Shortly after court adjourned, Mrs. Law drove in her car to the lunch counter, obtained the lunch and then drove to her home. She usually drove her car to the front of her residence, but on this occasion the car was driven to the garage in the rear of the residence. The inference is irresistible that she got from her home or garage several bottles of home-made beer which she put in the rear of her car and drove away in the direction of the Satsop river.

The respondent departed from the court house on or about eleven fifteen a. m. that day, and did not return, as the court adjourned, as stated above, at twelve noon. When court adjourned, Mrs. Law departed with another lady from the court house. She parted from the lady, returned to the court house, where she remained for a few minutes, and then went to her car. The investigators followed Mrs. Law. After driving several miles, she stopped her car beside and at a curve in the road. About five or ten minutes later, the respondent, driving alone in his car, arrived at the place where Mrs. Law was parked, slowed down as though he intended to stop, and thereupon Mrs. Law started her car and followed the respondent. At some distance beyond this point, the road forks. One branches to the left, crossing the Satsop river, and is the better road; the other continues up the river on the right hand side, and leads to Shelton. The right hand road runs along the hillside, and on the other side is low brushy land. After leaving the point where the road forks, there is no convenient place to stop for camping until one arrives at the Blanton ranch, several miles farther up the road. S. W. Blanton owns some pasture land along the Satsop river, which is covered with a growth of underbrush, though not very

thick, and a place where picnics are frequently held. There is a gate in the fence and a road running from the highway through this gateway for a short distance.

Arriving at this gate, the respondent stopped his car, and Mrs. Law, who was a short distance to the rear of him, did likewise. The respondent opened the gate and drove his car into the pasture a distance of three or four hundred feet, and parked the same near the river bank. Mrs. Law followed with her car and parked it beside respondent's. The parties were observed taking articles out of their respective cars consisting of the lunch package and some blankets. The blankets were spread upon the ground a short distance from the cars, and while the cars were readily observable from the highway, the place where the blankets were spread was not observable because of the thick growth of underbrush in that vicinity. The respondent and the lady arrived at the picnic ground about two o'clock in the afternoon. The investigators telephoned to one of the attorneys for the plaintiff city, and two of them and another party or two arrived some time later. Subsequently the other attorney for the plaintiff arrived pursuant to a telephone call. On several occasions during the afternoon, witnesses, consisting of the investigators, attorneys and others, worked their way through the pasture to within fifty to one hundred feet of the place where the blankets were. From that point they viewed respondent and Mrs. Law. At long intervals they were not under observation. The parties had their lunch, were observed to drink from the bottles taken from the car of Mrs. Law, and on at least one occasion the respondent was observed drinking from a dark, square bottle which he took from his car, and which contained whiskey. Some of these bottles were offered and received in evidence, the

bottles having been picked up and taken from the scene.

During the course of the afternoon, the respondent and Mrs. Law were observed, first about the cars getting out the luncheon and blankets, and thereafter lying between the blankets talking and laughing; and on one occasion walking hand in hand from the river. Shortly after arriving at the picnic ground, Mrs. Law donned a bathing suit, which she wore the remainder of the afternoon. It is not clear whether or not Mrs. Law actually went in bathing, though a few hundred feet below the place where the blankets were there is a pool suitable for swimming. About six thirty o'clock in the afternoon, when one of the attorneys for plaintiff city arrived, several parties, including one with a camera, made further observation of the respondent and Mrs. Law; and they were found, as before stated, engaged in low conversation and laughing. Thereupon the observers went to the place where the respondent and Mrs. Law were. The respondent arose from the blankets, he being fully dressed, as he had been all of the afternoon, so far as observed, but was in his shirt sleeves, the day being warm. Mrs. Law became hysterical, and covered up fully with the blankets. Upon insistence that her identity be disclosed, the upper blanket was partially removed, which sufficiently revealed her face and the fact that she still had on the bathing suit. Both the respondent and Mrs. Law asserted that nothing had been said about the case that afternoon. When the respondent was asked for an explanation, he stated they were having a little party. All parties then returned to Montesano. The next day a conference was held in the office of the respondent between the attorneys for the plaintiff and defendant and it was finally agreed that the jury be discharged, the case proceed to trial before the court without a

jury, and that the judge be called upon to render a decision fixing the value of defendant's property. This agreement was consummated. A few days thereafter Mrs. Law disappeared, and her whereabouts were unknown at the time of the hearing. The meeting between the respondent and Mrs. Law at the Blanton picnic ground was prearranged between them.

"As to whether or not the respondent made this engagement for the purpose of influencing Mrs. Law as a juror is a question upon which minds may differ. The members of the board are inclined to the view that the purpose of this meeting was to have illicit relations and satisfy their mutual desires rather than a preconceived plan on the part of the respondent to use this method of bribing or corrupting a juror, but we believe the ultimate effect upon the juror and her subsequent attitude toward the cause represented by the respondent, if she had continued as a juror, would have been the same regardless of which view one might take of the object and purpose of the respondent in making and keeping this engagement."

Respondent's explanation of the matter was as follows: The respondent had no acquaintance with Mrs. Law prior to her becoming a juror. The first special notice he took of her was on an occasion on July 18, when he was driving to Elma to attend a dinner. On that occasion the driver of a car behind him sounded a horn several times and drove by him, stopped and motioned him to stop. He then discovered it was Mrs. Law, who inquired as to his destination, and he informed her and then went on his way. Within a week prior to July 20, he was obliged to park his car in a certain place opposite the front of the court house because his usual place of parking had been taken. When he came from the court house, Mrs. Law approached from the rear of his car, and they passed the time of day. Prior to the commencement of the

trial, respondent did not understand that he was to take the leading part in the conduct of the same. Upon arrival of the other attorneys, it was considered that he should do this, which necessitated a great deal of preparation which he had not anticipated would be required, and it became necessary that he work in his office until late hours at night. The night work and the ordeal of the trial by July 20 mentally and physically exhausted him. Informed by his wife, who was then in Seattle, that she and the children would be in Shelton the afternoon of July 20, respondent prepared to meet them at that place. He departed from the court house on or about eleven fifteen the morning of July 20, and did not return to the court house that day, as court adjourned at noon. Respondent took some of his books and papers to his office in Aberdeen, had lunch and started for Shelton, taking the most direct road leading to that place. He passed a car standing beside the road and later observed that this car was following him and the driver would frequently sound the horn. He ascertained the fact that the driver of the car following him was Mrs. Law. In view of her previous approach when she overtook him on his way to Elma, he was somewhat suspicious and was curious to know what she wanted; so he stopped his car at a point by the Blanton pasture; and, in order to learn what was the meaning of her attitude, he drove his car through the pasture gate and she followed. Mrs. Law inquired about an engineer, who was a witness for the defendant water company. A few minutes after their arrival Mrs. Law gave him a bottle of home-made beer, which he drank. The effect of the liquor was to make him very sick; so much so, that he sat down on the ground to recover, whereupon Mrs. Law got a robe out of her car and lay down on it. During the rest of the afternoon, he was too ill to continue on his journey

to meet his family and that at some time during the afternoon the other blanket was spread over him; that he was too ill to be conscious of what Mrs. Law was doing or her being in close proximity to him. He did not bring with him any liquor, or drink any liquor that afternoon other than the beer; that during the afternoon nothing was said between himself and Mrs. Law with reference to the case on trial or its merits.

Rejecting respondent's version, the board of law examiners said:

"The version of this transaction given by the respondent is wholly at variance and in conflict with the testimony of all of the other witnesses who observed the respondent and Mrs. Law throughout the afternoon of July 20, and is so unusual and contrary to what would ordinarily take place upon such an occasion that we cannot accept it as true. We cannot believe that a lawyer of the age, experience and standing of the respondent would be led into the position he was in by a juror in the midst of the trial of an important lawsuit merely to satisfy his curiosity as to what she wanted or what her motive was in approaching him in the manner he states.

"The conclusive and undisputed testimony of members of the bar of the state of Washington who have been acquainted with and observed the respondent over a long period of years is that he has always borne an excellent reputation as an ethical lawyer and one observing the canons and traditions of the profession and practice and this we find as an established fact.

"The offense committed by the respondent is not only unusual but extremely grave. The integrity of a jury must be preserved by the members of the bar or its usefulness will be destroyed and confidence in it lost. After spending this afternoon with this juror under the circumstances as disclosed by the evidence, the respondent would unquestionably have an influence over her not enjoyed by opposing counsel, and the cause he represented would have certainly been materially aided. The juror was one of the leaders of

that body and her influence in the jury room would have been considerable. The relationship thus established between the respondent and the juror gave him as much advantage and perhaps more than if she had received a direct bribe. We cannot regard this as a mere act of personal indiscretion. The act of the respondent went much further than this and its consequences were far-reaching. The act was without excuse and to us seems indefensible, and notwithstanding the previous good reputation of respondent we feel that justice demands the conclusion that he should no longer be permitted to practice law.''

 The board recommended that, for the commission of the offense charged, the respondent be disbarred from the practice of law. A careful examination of the record discloses that the evidence supports the findings. It follows that the recommendation of the state board of law examiners must be, and it is, approved.

The record is bare of aught in extenuation of respondent's conduct. To hold that the acts of respondent constituted a mere indiscretion—and such would in effect be the holding if less than disbarment, as recommended by the board, be imposed—would be a palliation of respondent's offense. We cannot by a softer name make the offense of respondent less evil.

Such conduct as that of which respondent is guilty would render powerless the administration of justice. Whether prompted by curiosity or concupiscence, or whether the purpose be to influence the action of the juror in the cause in favor of his client, when an attorney engaged in the trial of a cause goes on a picnic with a female member of the jury trying the cause, remaining in the company of that woman juror for four hours on a pallet, eating sandwiches and drinking intoxicants, that attorney merits permanent disbarment.

It is ordered that the respondent be and he is hereby permanently disbarred from the practice of law in this state.

MITCHELL, C. J., PARKER, MAIN, and BEELER, JJ., concur.

HOLCOMB, J. (specially concurring)—It ought to and usually does suffice, in a case where the action of the board of law examiners is not disturbed nor modified, after an examination of the record, simply to state the nature of the charge or charges of unethical conduct against an attorney and approve the recommendation of the board. This accomplishes all the purposes of our system of protecting the courts, the bar and the public against unethical practitioners. No useful purpose to respondent, the bar, or the courts, is subserved by encumbering our reports by incorporating in the decision of the court, thus perpetuating to remote posterity, all the baneful details relating to this charge of unethical conduct as an attorney. These details will generally be of interest only to avid readers of erotic literature to whose perverted appetites this court should not cater. Nor, is it needful, after inflicting condign punishment upon respondent, to add opprobrium to him and disgrace to those who bear his name.

However, after thorough consideration of the case, I am obliged to concur in the result.

TOLMAN, J. (dissenting)—While, like the board of law examiners and those who have signed the majority opinion, I cannot accept as true respondent's story of what occurred, yet I am convinced that his only purpose was to gratify his passions by which he was then blinded, and that he had no conscious intent to influence the juror. But, even so, the conclusions of the board as to his culpability inevitably follow.

My only doubt is as to the penalty to be inflicted. Respondent is a lawyer of unusual ability. His clear conception of legal principles, his ability to express those principles and apply them to an existing state of facts, and his studious nature and industry have made him, in the past, of great assistance to this court and no doubt to the trial courts, to say nothing of his value to his clients.

If, as the board believed and as I believe, there was no conscious intent to thwart justice, may not respondent's offense, great though it is, be repented of and in time lived down? Human nature has its weaknesses and few there are who can withstand every possible temptation, especially if suddenly presented. For lesser offenses we have permanently disbarred, and rightly so, because the nature of the offense indicated that the attorney was unfit to practice his profession and would remain unfit. But this respondent is a trained, well educated and, generally speaking, a cultured man, who must from his very nature keenly appreciate the enormity of his offense, and with his mentality, he will, through what has already occurred and the publicity attendant thereon, have learned the lesson which he needed. If this be so, his great value to the courts, to the profession, and to the public as a lawyer may be, to some extent, restored and re-established at some time in the future after a sufficiently long term of suspension with opportunity for reflection, reformation and the building up of a determination to sin no more.

I believe that to permanently disbar the respondent and drive him forever from the profession will mean a handicap to the development of the law and to the administration of justice in this state; that a suspension of sufficient length of time to mark thoroughly our condemnation of his actions will serve every proper pur-

pose, and that thereafter his restoration to the practice will be reasonable and just and for the best good of the public.

It is my judgment that a suspension for a period of three years is a sufficient penalty and will bring the best results for the public, even if the respondent be considered entitled to no consideration in that respect.

I therefore dissent from the order of permanent disbarment.

BEALS, J. (dissenting)—After careful consideration, I am of the opinion that respondent should be suspended from the practice of his profession for the period of three years. I accordingly dissent from the order of permanent disbarment.

FULLERTON, J. (dissenting)—I take a different view of the evidence than that expressed in the majority opinion. In my view there are circumstances not noticed therein, which, while they do not excuse the respondent from all blame, so far mitigate his offense as not to justify the very severe penalty inflicted upon him. I therefore dissent from the order directed to be entered.