[No. C. D. 1366.   *En Banc.*   July 9, 1934.]

*In the Matter of the Application of* THEODORE B. BRUENER *for Reinstatement.*[1]

*James P. H. Callahan* and *Theodore B. Bruener,* for petitioner.

*A. A. Hull,* for board of governors.

MAIN, J.—This case is here on the petition of Theodore B. Bruener, a disbarred attorney, asking to be restored to the privilege of practicing law in this state.

The petitioner was disbarred December 11, 1930. *In re Bruener,* 159 Wash. 504, 294 Pac. 254. December 1, 1932, he petitioned this court for reinstatement, and the matter was referred to the then board of law examiners, two of which board, after a hearing, recommended his reinstatement and one member dissented

[1] Reported in 34 P. (2d) 437.

therefrom. The matter was here heard upon the report of the board, and February 6, 1933, the petition was denied. March 9, 1934, a petition was filed before the board of governors of the state bar association (chapter 94, Laws 1933, p. 397, Rem. 1933 Sup., § 138-1 *et seq.*), asking reinstatement. The board heard the matter, and on April 14, 1934, denied the same.

In the motion, which was supported by all the members of the board, with the exception of the president thereof, no reason is given, but simply a general recommendation that the application for reinstatement be denied. The president of the board, who had previously represented the petitioner, took no part in the proceedings before the board. The board of governors transmitted a copy of the proceedings to this court, and the matter came regularly on for hearing.

Upon the hearing, one member of the board appeared in opposition to the granting of the petition, and stated, if we correctly gathered his thought, that the action of the board was, at least in part, based upon the assumption that to grant the petition would, in effect, be overruling the action of this court in denying the previous petition. In so far as the action of the board was based upon this assumption, if it was so based in any particular, this was a mistaken view. When an application for reinstatement is made by a disbarred attorney, it should be considered on its merits. This court, in a number of cases wherein the attorney had been disbarred and an application for reinstatement had been made and denied, has granted a subsequent application. One of the cases is that of Richard Gowan, who was disbarred November 19, 1918. *In re Gowan,* 104 Wash. 166, 176 Pac. 7. Subsequently, an application for reinstatement was made and denied January 5, 1927. *In re Gowan,* 141 Wash. 523, 251

Pac. 773. Another application was made, which was granted January 31, 1928.

In so far as we are informed, no court has held that an order of disbarment or an order denying an application for reinstatement is *res judicata* and forecloses any further consideration on the merits. We do not understand that it is contended otherwise, so far as the action of the court is concerned. When an application by a disbarred attorney for reinstatement is made, the question is whether the applicant is a fit and proper person to practice law. In determining this question, the court will take into consideration the applicant's character and standing in the community in which he resided prior to the disbarment, the ethical standards which he observed in the practice of law, the nature and character of the charge for which he was disbarred, his conduct subsequent to the disbarment, and the time that has elapsed between the disbarment and the application for reinstatement. 2 R. C. L. 1113; 6 C. J. 615; *In re Mash,* 39 Cal. App. 548, 179 Pac. 897; *Kepler v. State Bar of California,* 216 Cal. 52, 13 P. (2d) 509; *State ex rel. Spillman v. Priest,* 123 Neb. 241, 242 N. W. 433; *In re Simpson,* 11 N. Dak. 526, 93 N. W. 918.

In the present case, the petitioner, prior to his disbarment, had lived and practiced law in one community for twenty years or more, and during all that time was a man of good standing in the community and respected by those who knew him. His ethical standards were high in that profession, and at no time was his conduct as a lawyer ever questioned. Subsequent to the disbarment, he has meticulously observed the order of the court, and, as appears from the record in this case, has retained his standing in the community where he has continuously resided.

We recognize that the charge which resulted in the disbarment of the petitioner was a grave one, and we in no sense here minimize it. If the petitioner, however, is reinstated, nothing can be more certain in human affairs than that he will at no time repeat the offense for which he was disbarred, or one of any similar nature. The petitioner is now fifty years of age, has spent his life in the practice of law and knows no other vocation. The fact that he made one grave mistake, from which it is apparent that he has suffered intensely as the result thereof, should not alone deprive him of the privilege of earning a livelihood for himself and family in the only way open to him.

When the first petition was denied by this court, it was because there were not five members of the court who at that time believed that sufficient time had elapsed since the order of disbarment had been entered. It is now approximately three years and a half since the order was entered, and almost five years since the occurrence which caused the disbarment took place. We are of the opinion that neither the interests of society, the welfare of the bar, nor the integrity of the courts, demand that the petitioner should be further deprived of earning a livelihood for himself and family at the only vocation which he knows, that of the practice of law, and to which he has devoted his life up to this time.

The prayer of the petition is granted, and the petitioner is restored to the privilege of practicing law in this state.

BEALS, C. J., TOLMAN, HOLCOMB, STEINERT, and GERAGHTY, JJ., concur.

BLAKE, J. (dissenting)—The holding here is essentially predicated on the theory that the judgment of disbarment was wrong from the beginning; that peti-

tioner's offense merited, as contended by the minority in the disbarment proceedings, no more than three years suspension. I could agree to this if the offense were only an affair with a woman. The offense, however, is essentially more grave than that. The woman in the case was not only a woman—she was a juror in the cause in which petitioner was taking an active part as counsel. For the time, she personified the blindfolded goddess. When he, who was sworn to guard, violated the chastity of Justice, judgment of disbarment followed of necessity—not to punish him but to vindicate *her* honor. By their unanimous report, the board of governors have expressed their belief that that judgment must stand, in order that the accomplished vindication may be sustained. I can but agree with that view.

Comparisons are said to be odious—possibly because they make inequalities to appear so glaring. To undertake to do comparative justice is not a sound or practicable principle for courts to act upon. Yet Lord Mansfield said: "It is almost as important that justice appear to be done as it is that justice actually be done." On the same day that petitioner's application for reinstatement was heard, the court had before it the unanimous recommendation of the board of governors for the suspension, for one year, of an attorney whose talents, standing and prominence at the bar were not in any degree comparable to petitioner's. That attorney's offense consisted in using, under the stress of dire economic necessity, a few dollars belonging to his clients. In his case the recommendation of the board of governors was adopted by the court. Although at the time of hearing he had made complete restoration, I hold no brief in extenuation of his offense. But, by comparison, I cannot bring

myself to believe that these "judgments are true and righteous altogether."

MITCHELL, J. (dissenting) — I concur in Judge Blake's dissenting opinion.

Upon the decision of disbarment in this case, the petitioner applied for a rehearing and for a modification of the decision to "suspension of not exceeding one year," thus by insinuation indicating a preference for *less* than a year. That petition was denied April 2, 1931, until which date petitioner was allowed to practice law. Twenty months thereafter, he petitioned for reinstatement, and waged a contest thereon before the then state board of law examiners and in this court until February 6, 1933, when the petition was denied. On March 9, 1934, less than three years after his right to practice law ceased, he filed with the board of governors of the state bar association his present successful petition for reinstatement—approximately one-third of the time covered by the disbarment in the case referred to in the majority opinion, which was for offenses almost trivial compared with the offenses involved in the present case; and less time from the effective date of disbarment to the date of filing the present petition for reinstatement than that suggested in any of the several opinions written upon the decision of disbarment.

Frankly, I am unable to appreciate petitioner's frequent applications for relief. To me, they seem to approach unwarranted assurance and to breathe of a fitful, feverish, arrogant purpose to suggest that we should even relent, as though charging us with haste and unwisdom in our decision.

The petitioner claims to be a first offender—thousands of that kind have fared worse. Again, he claims to have refrained from practicing law since his pe-

tition for rehearing was denied. Is obedience to the solemn judgment of a court disbarring an attorney any test of the right to reinstatement by that court? What else should or could he have done? If not doing what one is forbidden to do had been petitioner's rule of conduct while the trial of the condemnation suit was going on at Montesano, during which time he and the woman juror involved made their lonely trip together, then no record of such unwholesome, offensive escapade could ever have been written.

The contrariety of opinions on the order of disbarment shows the care and concern of the members of the court, six of whom preferred the words "permanent disbarment." I mention those words, not claiming, of course, that they foreclose reinstatement, but as indicating a lack of that insincerity that necessarily would be attributable to them if at that time one could have seen the picture now made about three years later. It was in a sense of serious candor I subscribed to those words. But, alas, I have now come to know they mean suspension from practice for *just a little while,* "Only this and nothing more."

MILLARD, J. (dissenting)—I concur in the dissents of Judges Mitchell and Blake. In the majority opinion (*In re Bruener,* 159 Wash. 504, 294 Pac. 254), reciting that the petitioner merited permanent disbarment, we said:

"To hold that the acts of respondent constituted a mere indiscretion—and such would in effect be the holding if less than disbarment, as recommended by the board, be imposed—would be a palliation of respondent's offense."

We now recede from that position, and hold, in effect, as argued in one of the dissenting opinions (159 Wash. 513-514) that, as respondent

172

" . . . is a trained, well educated and, generally speaking, a cultured man, who must from his very nature keenly appreciate the enormity of his offense, and with his mentality, he will, through what has already occurred and the publicity attendant thereon, have learned the lesson which he needed,"

his great value to the courts, to the profession, and to the public, is such, despite the enormity of his offense, that the bench, the bar, and the public, should not be deprived of the value of respondent's training, education and culture; that is, if sufficiently talented, one should suffer a less drastic penalty than one not possessed of equal ability, in view of the fact that the cultured man would suffer mental torture to a degree of which his less richly endowed brother would be incapable. The gifted lawyer is now assured that he need have no apprehension that any penalty other than temporary suspension and the attendant publicity will be exacted for his disregard of the laws of God and man; that the greater his training, education and culture, the less severe the penalty.

That is not my conception of the criterion by which we should determine the punishment for defiance of rules, customs, conventions and laws. I can not agree that the penalty should be less harsh because of the offender's exceptional training, education and culture; rather, they more strongly accentuate the enormity of the offense, and such an offender should be held to greater responsibility than one of more limited mental endowment and opportunities. One's responsibility should be measured by the opportunities which he has had of knowing better or worse.

I am of the view that the condonation of respondent's conduct is another step toward rendering powerless the administration of justice.