[No. C.D. 4760. En Banc. October 17, 1985.]

*In the Matter of the Disciplinary Proceeding
Against* GORDON L. WALGREN, *an
Attorney at Law.*

558

*James K. Sells* and *McCluskey, Sells, Ryan, Olbertz & Haberly,* for petitioner.

*Robert T. Farrell,* for Bar Association.

DOLLIVER, C.J.—Gordon L. Walgren, who was disbarred on June 21, 1982, petitions for reinstatement as an attorney. On December 17, 1984, the Board of Governors of the Washington State Bar Association held a public hearing to consider his petition. Voting 7 to 2, the Board recommended reinstatement on the condition Walgren take and pass the bar examination. We hold Walgren may not be reinstated into the Washington State Bar until he has sat-

isfactorily completed the conditions of his parole and is discharged therefrom pursuant to the applicable federal statute as determined by the United States Parole Commission. *See* 18 U.S.C. §§ 4210, 4211 (1982).

## I

Gordon L. Walgren was admitted to the Washington State Bar in October 1957. In 1966, he was elected to represent the Twenty-Third District in the Washington State House of Representatives. In 1968, he was elected to the Washington State Senate, and in 1975 he was elected Majority Leader of the Senate.

Early in 1980, a 29-count federal indictment alleged Walgren, along with John Bagnariol and Patrick Gallagher, violated the federal racketeering laws, codified at 18 U.S.C. §§ 1961-1968 (1982) (referred to as the "RICO" statute). The facts leading to the federal indictment appear in the Ninth Circuit opinion in which Walgren's conviction was affirmed. See *United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1981). The indictment generally alleged Walgren acted in furtherance of a criminal "enterprise", the goal of which was to promote gambling legislation in the state of Washington. In exchange for Walgren's efforts, he was allegedly to receive 6 percent of the profits of the gambling operations. Shortly thereafter, the Washington State Bar Association initiated disciplinary hearings against Walgren. On December 1, 1980, Walgren was suspended from the practice of law.

The federal RICO statute is triggered when a person is found to be a member of an "enterprise" and commits two acts of "racketeering activity" within 10 years of each other in furtherance of the enterprise. *See* 18 U.S.C. § 1961(5) (1982). An "enterprise" is defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).

At the close of the government's case, United States District Court Chief Judge Walter T. McGovern dismissed 6 of

the 19 counts brought against Walgren, including the charges of bribery and conspiracy. Of the 13 counts that went to the jury, Walgren was found guilty under the RICO, mail fraud, and travel act statutes (18 U.S.C. §§ 1962(c), 1341, and 1952(a)(3) (1982), respectively). Walgren was acquitted on 5 of the 13 counts and a hung jury resulted on the others.

The two acts of "racketeering activity" supporting Walgren's RICO conviction were violations of the mail fraud and travel act statutes. The mail fraud violation was triggered when Walgren knowingly mailed a public disclosure form which failed to indicate that he had received a newspaper clipping service, valued at approximately $80, which had been "donated" by an FBI agent. The travel act violation was predicated on an interstate telephone call made to Walgren in which he was alleged to have discussed the enterprise with an FBI agent. The Ninth Circuit confirmed there was ample evidence in the record from which the jury could have concluded the mail fraud and travel act violations were in furtherance of the "enterprise". *United States v. Bagnariol,* at 896–99. There was no evidence Walgren introduced legislation or had received money in furtherance of this agreement.

On November 24, 1980, Walgren was sentenced to 5 years' imprisonment at the Federal Prison Camp in Lompoc, California. Walgren began serving his sentence on May 21, 1982, shortly following the time at which his petition for certiorari to the United States Supreme Court was denied. On June 21, 1982, Walgren stipulated to disbarment.

After having served 2 years, Walgren was released on parole on May 21, 1984. The parole, which is supervised by a Seattle–based federal parole officer, officially terminates on May 20, 1987, although the record indicates parole might end as early as May 1986.

On July 31, 1984, Walgren applied for reinstatement to the bar. A hearing before the Board of Governors was held on December 17, 1984, at which Walgren presented numerous witnesses as well as over 100 letters in support of his

reinstatement. The record also contains a psychologist's report stating that "Mr. Walgren's level of psychological functioning and psychological integrity is adequate" and that the psychologist's evaluation of Walgren "does not reveal any significant psychological reasons why Mr. Walgren could not effectively practice law."

## II

 The major consideration in reinstatement proceedings is whether the disbarred attorney has shown those weaknesses which produced the earlier misconduct have been overcome. *In re Egger,* 93 Wn.2d 706, 707, 611 P.2d 1260 (1980) (citing *In re Johnson,* 92 Wn.2d 349, 350, 597 P.2d 113 (1979)). The court has specifically utilized eight criteria in making this assessment:

> (a) the applicant's character, standing, and professional reputation in the community in which he resided and practiced prior to disbarment; (b) the ethical standards which he observed in the practice of law; (c) the nature and character of the charge for which he was disbarred; (d) the sufficiency of the punishment undergone in connection therewith, and the making or failure to make restitution where required; (e) his attitude, conduct, and reformation subsequent to disbarment; (f) the time that has elapsed since disbarment; (g) his current proficiency in the law; and (h) the sincerity, frankness, and truthfulness of the applicant in presenting and discussing the factors relating to his disbarment and reinstatement.

*In re Eddleman,* 77 Wn.2d 42, 44, 459 P.2d 387, 461 P.2d 9 (1969).

Criteria (a), (b), (g), and (h) do not require substantial discussion. Walgren's character, standing, and professional reputation in the community are not seriously questioned. There is no evidence of any other wrongdoing in Walgren's career, either as an attorney or politician. No question is raised in the record as to Walgren's ethical standards while he practiced law nor has any doubt been cast on Walgren's proficiency as an attorney. Finally, there is no evidence suggesting that Walgren has not been truthful, frank, and sincere in discussing his disbarment and reinstatement.

More serious questions arise, however, as to whether Walgren has met criteria (c), (d), (e), and (f).

## A

### ATTITUDE

The central question in an attorney reinstatement matter is whether the attorney has been rehabilitated. While evidence of rehabilitation consists primarily of acts and conduct, rehabilitation is also demonstrated by the attorney's remorse for and appreciation of the misconduct for which he was suspended or disbarred. *In re Krogh,* 93 Wn.2d 504, 507, 610 P.2d 1319 (1980); *In re Simmons,* 71 Wn.2d 316, 319–20, 428 P.2d 582 (1967). *Accord, In re Wright,* 102 Wn.2d 855, 859, 690 P.2d 1134 (1984). Before the Board of Governors, Walgren testified:

Q [by James K. Sells, Walgren's attorney] Now, despite all that and with all that in mind, you are aware, are you not, that this Board must accept the jury's finding of guilty?

A [Walgren] Absolutely.

Q Do you accept the jury's finding of guilty?

A Yes, I do.

Q Do you agree with the jury's finding of guilty?

A *I certainly do not.*

Q How do you explain . . . the difference between accepting the finding of guilty and agreeing with the finding of guilty?

A Well, I understand under our system of law, a system which I truly endorse and, as I told the judge during my sentencing, I totally endorse, it is the best system we have in the world in my opinion. When that jury comes back with its findings, that is what it is, and I have been on both sides—all sides, I guess now, except sitting in front making the determination. . . .

. . . I have said many, many times before when that jury gives the word, that is what it is under the law and that is the way it is under the law as far as I am concerned. I have been found guilty by a jury and I stand guilty, convicted by that jury and having judgment pronounced against me.

*That does not, however, change what I know to be the fact and what I feel in my heart and what I know*

*was the situation.* I can accept the verdict as a lawyer but I certainly emphasize that I do not agree with it.

(Italics ours.)

The question of innocence and guilt is not at issue in a reinstatement proceeding. *In re Lonergan,* 23 Wn.2d 767, 771, 162 P.2d 289 (1945). The purpose of securing the attorney's repentance, moreover, is not to coerce the attorney into admitting intentional misconduct. *In re Eddleman, supra* at 45 n.1. Rather, it is to assure the court that the attorney recognizes past wrongdoing so as to ensure it will not be repeated in the future. *In re Hiss,* 368 Mass. 447, 333 N.E.2d 429 (1975). As one court noted:

> [R]epentance and rehabilitation are not the same. Rehabilitation, the most important consideration in reinstatement proceedings, is a matter of one's "return" to a beneficial, constructive and trustworthy role. Repentance is a matter of contrition and regret.

*In re Wigoda,* 77 Ill. 2d 154, 159, 395 N.E.2d 571 (1979).

In assessing Walgren's testimony before the Board of Governors, we turn to other cases in which an attorney has denied having committed the offense for which he was found guilty. *In re Hiss, supra,* involved the effort of Alger Hiss to be reinstated into the Massachusetts Bar 23 years after he was disbarred for committing perjury before a grand jury. The court rejected the Bar Association's position that because Hiss continued to assert he was innocent he could not be reinstated. The court reasoned:

> The continued assertion of innocence in the face of a prior conviction does not, as might be argued, constitute *conclusive* proof of lack of the necessary moral character to merit reinstatement. . . .
>
> Simple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal *act* he honestly believes he did not commit. For him, a rule requiring admission of guilt and repentance creates a cruel quandary: he may stand mute and lose his opportunity; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law. . . . Honest men

would suffer permanent disbarment under such a rule. Others, less sure of their moral positions, would be tempted to commit perjury by admitting to a nonexistent offense (or to an offense they believe is nonexistent) to secure reinstatement.

*In re Hiss,* at 457–59. *See also In re Wigoda, supra* (city alderman convicted of accepting bribe may be reinstated despite his continuing assertion of innocence).

The continued assertion by Walgren of his innocence does not reflect negatively on our assessment of his rehabilitation. While asserting he was innocent, Walgren accepts the verdict as the law and has served his sentence faithfully. This contrasts markedly with *In re Wright, supra* at 859, in which the applicant asserted his act of murder did not "represent a breach of any fiduciary duties" nor did it "involve any acts of dishonesty" but was a product of "bad judgment".

The distinction between accepting and respecting the system which found one guilty and conceding guilt is not without precedent in this state. In *In re Simmons,* 71 Wn.2d 316, 428 P.2d 582 (1967), a judge was disbarred for having made disparaging remarks about the judicial system while he was on the bench. Despite evidence the judge was otherwise well qualified to practice law, this court denied his application for reinstatement on the grounds:

> There is, in the statement of the petitioner before the [B]oard [of Governors], a tenor which leaves the impression that his new attitude is based upon a conclusion that it is wise to accept such duties, because the consequences of failing to accept them may be painful, rather than a *belief in the wisdom and justice of the rules imposing those duties.*

(Italics ours.) *Simmons,* at 320. Walgren's attitude regarding his convictions is not inconsistent with that necessary for reinstatement; he accepts and respects the system which found him guilty of his acts and has suffered the punishment and stigma brought on by his convictions.

## B
### SUFFICIENCY OF TIME/NATURE
### OF THE ACT

A disbarred attorney should not be reinstated until "sufficient time has elapsed to enable him to actually demonstrate, by conduct, that he is, in fact, worthy of trust and confidence." *In re Lonergan,* 23 Wn.2d 767, 771, 162 P.2d 289 (1945). The purpose of this rule is not punishment nor does the mere lapse of time constitute evidence of rehabilitation. *In re Eddleman, supra; In re Beakley,* 6 Wn.2d 410, 425–26, 107 P.2d 1097 (1940). Rather, the element of time is crucial to the question whether there is sufficient evidence of the attorney's reputation so as to entitle the applicant to apply for readmission.

In *In re Lonergan,* an attorney stipulated to disbarment after he was found guilty of federal mail fraud arising out of a speculative silver market operation. After serving 1½ years in prison, the attorney was released on a 2–year parole period. One month after he successfully completed parole, and with considerable support from prominent members of the legal community, the attorney applied for reinstatement. This court denied Lonergan's first application for reinstatement, reasoning as follows:

> [O]ne who has been disbarred—and one who has resigned in order to forestall disbarment is in the same position—should not be reinstated until sufficient time has elapsed to enable him to actually demonstrate, by conduct, that he is, in fact, worthy of trust and confidence. In effect, he is expected, and required, to establish a new reputation.

*In re Lonergan,* at 771. Lonergan was ultimately reinstated 7 years after he resigned from the bar, 6 years subsequent to his release on parole, and 4½ years after his successful completion of parole.

*Lonergan* raises two issues which bear directly on Walgren's application for reinstatement. The first, considering the conduct for which Walgren was disbarred, is whether sufficient time has elapsed to establish, and whether he in

fact has established, a "new reputation". The second is whether, as a matter of law, a disbarred attorney may be reinstated before he has successfully completed the terms of his parole.

### 1. Time

Unlike certain other states, Washington does not have a rule in which a person convicted of a felony may not be readmitted into the bar. *Cf.* N.Y. Jud. Law § 90(5)(b) (McKinney 1983) (mandatory 7–year period); Utah Code Ann. § 78–51–37 (1953). The sufficiency of time determination is made by weighing the nature of the offense against the time which has elapsed subsequent to disbarment. *See* McChrystal, *A Structural Analysis of the Good Moral Character Requirement for Bar Admission,* 60 Notre Dame L. Rev. 67, 86–92 (1984); Comment, *Past Crimes and Admission to the Bar,* 5 J. L. Prof. 179, 185 (1980).

A survey of Washington cases in which reinstatement was granted presents empirical evidence that the time period following Walgren's suspension and disbarment, while perhaps brief (just over 4 years), is not disproportionate to other attorneys who have been reinstated. *See In re Bowden,* 99 Wn.2d 684, 663 P.2d 1349 (1983) (reinstatement 8 years after disbarment); *In re Batali,* 98 Wn.2d 610, 657 P.2d 775 (1983) (reinstatement 8 years after disbarment); *In re Egger,* 93 Wn.2d 706, 611 P.2d 1260 (1980) (reinstatement 4 years after disbarment); *In re Krogh,* 93 Wn.2d 504, 610 P.2d 1319 (1980) (reinstatement 5 years after disbarment); *In re Johnson,* 92 Wn.2d 349, 597 P.2d 113 (1979) (reinstatement 11 years after disbarment); *In re Chantry,* 84 Wn.2d 153, 524 P.2d 909 (1974) (reinstatement 9 years after disbarment); *In re Shain,* 24 Wn.2d 598, 166 P.2d 843 (1946) (reinstatement 7 years after disbarment); *In re Lonergan,* 23 Wn.2d 767, 162 P.2d 289 (1945) (reinstatement 7 years after disbarment); *In re Greenwood,* 22 Wn.2d 684, 157 P.2d 591 (1945) (reinstatement 5 years after disbarment); *In re Lillions,* 196 Wash. 272, 82 P.2d 571 (1938) (reinstatement 4 years after disbarment); *In re*

*Bruener,* 178 Wash. 165, 34 P.2d 437 (1934) (reinstatement 4 years after disbarment).

Furthermore, there are several non–Washington cases involving crimes committed by an attorney who was a public official where the attorney has been reinstated in less than 4 years from the time he was disbarred. In *In re Wigoda,* 77 Ill. 2d 154, 395 N.E.2d 571 (1979), the attorney was a city alderman who had been convicted for receiving a $50,000 bribe and failing to file tax returns pursuant to this bribe. The attorney was reinstated by the Illinois Supreme Court 3½ years after his disbarment and 3 years after his release from prison. To justify the short reinstatement period, the court noted the attorney's activities in prison and the numerous testimonials of his character. Similarly, in *In re Polack,* 60 N.J. 548, 292 A.2d 1 (1972), a judge who had been convicted of willfully failing to file federal income tax returns was reinstated after 2½ years of suspension. *See also In re Cohen,* 83 Ill. 2d 521, 416 N.E.2d 256 (1981) (trustee of village board convicted of accepting bribes reinstated after 5–year disbarment). *But see In re Gordon,* 385 Mass. 48, 429 N.E.2d 1150 (1982) (judge who was convicted of bribery and larceny not reinstated even after 17 years of disbarment).

The next issue is whether Walgren's activities during the period following his disbarment establish the "new reputation" he must develop subsequent to disbarment. The record reflects that Walgren was an exemplary prisoner at the Federal Prison Camp in Lompoc, California. In the year subsequent to his release on parole, Walgren has returned to public life in this state. He has made numerous speeches in the area, serves as a member on the boards of the Kitsap County Council on Alcoholism and the Bremerton Redevelopment Council, and manages his personal affairs. Walgren states he is currently a "political consultant" for several Puget Sound firms and is registered with the Public Disclosure Commission as a lobbyist. Nowhere in the record is there the slightest evidence Walgren has done anything dishonorable or unbefitting an attorney subsequent to his

release. To the contrary, the record contains numerous letters and statements reflecting an excellent community reputation. We conclude Walgren in fact has proved he is rehabilitated.

 This is not a situation in which an applicant for admission presents us with a criminal record dotted with violent crimes in which the applicant's role and culpability is uncontested. *Cf. In re Belsher,* 102 Wn.2d 844, 689 P.2d 1078 (1984) (planting bomb in parents' car); *In re Wright,* 102 Wn.2d 855, 690 P.2d 1134 (1984) (second degree murder, possession of heroin, and unauthorized practice of law). While his guilt is not to be contested and we do not cast doubt on the federal RICO conviction, we do not know with precision the extent to which Walgren was involved in the criminal enterprise. Our inability to comprehend the exact role of Gordon Walgren in this enterprise certainly does not exonerate his breach of the public trust. It does, however, constitute a mitigating circumstance which bears on the question of whether sufficient time has elapsed for rehabilitation. *See In re Krogh, supra* at 506–07; *In re Cohen, supra* at 526–27. Furthermore, the crime which Walgren committed did not occur during the practice of law nor does it involve criminal abuse of the legal process, fraud, or embezzlement. *See* McChrystal, 60 Notre Dame L. Rev. at 89. We conclude sufficient time has elapsed following Walgren's suspension and disbarment in order for him to prove, and that he in fact has proved, he has been rehabilitated from the crime for which he was convicted.

## 2. Parole

Our research indicates the question of whether an attorney on parole for a felony conviction may be reinstated has not been squarely addressed by an American court. In Florida, an attorney convicted of a felony must be pardoned by the governor or the President of the United States prior to reinstatement; the rationale is that the attorney's civil rights must be restored prior to becoming an officer of the court. *Florida Bar v. Clark,* 359 So. 2d 863 (Fla. 1978); *In*

*re Florida Bd. of Bar Examiners,* 350 So. 2d 1072 (Fla. 1977). Analysis of this question requires us to examine the legal disabilities which attach to a paroled convict and the extent to which these disabilities should preclude the parolee from engaging in the practice of law.

At common law, a person convicted of a felony was considered to be "civilly dead". 21 Am. Jur. 2d *Criminal Law* § 1032, at 573 (1981); Special Project, *The Collateral Consequences of a Criminal Conviction,* 23 Vand. L. Rev. 929, 941–50 (1970). Over the centuries, this harsh penalty has been somewhat tempered by our federal and state constitutions. *See* U.S. Const. art. 3, § 3 ("no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted"); Const. art. 1, § 15 ("[n]o conviction shall work corruption of blood, nor forfeiture of estate"). The common law also has been modified by statute. *See, e.g.,* RCW 9.96A (proscribing discrimination, under certain circumstances, against ex–convicts).

Nevertheless, persons convicted of felonies, whose civil rights have not been restored, may not vote in this state. Const. art. 6, § 3 (the constitution states "infamous crime", which includes crimes punishable by death or imprisonment (RCW 29.01.080)). They may not qualify as jurors (RCW 2.36.070); they may not hold certain positions of trust such as executor or administrator (RCW 11.36.010); they are excluded from being guardians for incompetent or disabled persons (RCW 11.88.020(3)); their accounting licenses may be revoked (RCW 18.04.295(5)); their veterinarian licenses may be revoked (RCW 18.92.160(2), .180); their psychologist's licenses shall be revoked (RCW 18.83-.130(1)). *See generally* Special Project, 23 Vand. L. Rev. 929.

While the convicted felon is subject to a variety of civil disabilities, these disabilities may be expunged if the felon's civil rights are restored. States vary as to when a convicted felon's civil rights may be restored. Special Project, 23 Vand. L. Rev. at 1147–50. For persons on parole, the rule in Washington is that parolees' civil rights are restored when

they have satisfactorily performed the obligations of their paroles. RCW 9.96.050. *Accord,* Kan. Stat. Ann. § 22–3722 (1981); Ohio Rev. Code Ann. § 2967.16 (Page 1982); *Nibert v. Carroll Trucking Co.,* 139 W. Va. 583, 82 S.E.2d 445 (1954). *Cf.* Colo. Const. art. 7, § 10 (civil rights restored upon release from imprisonment). Civil rights also may be restored upon receipt of a pardon by the Governor of the State. RCW 9.96.010.

A person on parole does not have the full panoply of rights. *Morrissey v. Brewer,* 408 U.S. 471, 480, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). Parole is a state of conditioned liberty; a prison without walls. Fisher, *Parole and Probation Revocation Procedures After Morrissey and Gagnon,* 65 J. Crim. L. & Criminology 46, 47 (1974) (*Gagnon v. Scarpelli,* 411 U.S. 778, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973)); N. Kittrie & E. Zenoff, *Sanctions, Sentencing, and Corrections* 599 (1981). While a person on parole may participate in nonprison–like activities, "the State properly subjects him to many restrictions not applicable to other citizens . . ." *Morrissey,* at 482. A release on parole does not represent a pardon nor does it alter the criminal's sentence. Rather, it represents a less restrictive period during which criminals are offered the opportunity to prove they can reintegrate themselves into society without the imposition of the full prison sentence. *Morrissey,* at 477; Project, *Parole Release Decisionmaking and the Sentencing Process,* 84 Yale L.J. 810, 826–27 (1975). Under traditional indeterminate sentencing principles, release on parole implied only that persons were susceptible to rehabilitation and not that they had served completely a full sentence.

For purposes of his reinstatement proceeding, we need not determine the exact status of Gordon Walgren's civil rights. Nor do we hold today that restoration of civil rights is a condition precedent to reinstatement. There are issues, for example, as to whether his federal conviction affects his state–granted civil rights. *See In re Florida Bd. of Bar Examiners,* 341 So. 2d 503 (Fla. 1976) (state civil rights restoration statute applies to federal crime if federal crime

constitutes a felony under state law). We need not be more precise since the purpose of this proceeding is not to deprive Gordon Walgren of rights he would otherwise have under state law. Rather, in this court's capacity of regulating the practice of law, our duty is to determine whether Gordon Walgren, who has not yet completed his federal parole, may be adjudged to qualify for the privilege of practicing law.

We hold attorneys will not be reinstated into the bar until they have successfully completed the conditions of their parole and have been finally discharged. Reinstatement prior to the elapse of parole would not comport with the principle that a parolee is not to be accorded complete liberty and privilege prior to successful completion of parole. *See* RCW 9.96.050; *In re Lonergan,* 23 Wn.2d 767, 162 P.2d 289 (1945).

This rule is empirically supported by the weight of authority in this country. A computer survey of national reinstatement cases has failed to reveal a case in which an attorney has been readmitted prior to the elapse of his parole. *See, e.g., In re Batali,* 98 Wn.2d 610, 657 P.2d 775 (1983); *Preston v. State Bar,* 28 Cal. 2d 643, 171 P.2d 435 (1946) (reinstatement 4 years after pardon); *In re Koester,* 217 So. 2d 115 (Fla. 1969) (4½ years after completion of parole); *In re McGregor,* 122 So. 2d 7 (Fla. 1960) (11 years); *In re Hester,* 253 Ga. 365, 320 S.E.2d 541 (1984) (6 months); *In re Henritze,* 247 Ga. 620, 278 S.E.2d 383 (1981) (2 years 8 months); *In re Johnson,* 244 Ga. 109, 259 S.E.2d 57 (1979) (3 years 6 months); *In re Keane,* 102 Ill. 2d 397, 466 N.E.2d 208 (1984) (4 years 4 months); *In re Cohen,* 83 Ill. 2d 521, 416 N.E.2d 256 (1981) (5 years); *Maryland State Bar Ass'n Inc. v. Boone,* 255 Md. 420, 258 A.2d 438 (1969) (2 years); *In re Dimenstein,* 36 Conn. Supp. 41, 410 A.2d 491 (1979) (6 years); *Pharr v. Standing Comm.,* 32 Conn. Supp. 183, 346 A.2d 115 (1975) (5 years after pardon).

## C
### SUFFICIENCY OF PUNISHMENT

The thrust of this analysis is whether, in consideration of the nature of the act for which the attorney was convicted, the punishment suffered is sufficient to guarantee the oath of office will not again be forgotten by the attorney. *In re Krogh,* 85 Wn.2d 462, 479, 536 P.2d 578 (1975). In *In re Krogh,* 93 Wn.2d 504, 507, 610 P.2d 1319 (1980), the court found Egil Krogh had suffered enough punishment by having served time in prison, losing his government post, being disbarred for 6 years, and enduring the mental and emotional suffering attendant upon these penalties.

Gordon Walgren has suffered a punishment consistent with the gravity of his offense. As in *Krogh,* Walgren was convicted of a crime arising out of his duty as a public official. Both served approximately 2 years in prison. Both have suffered considerable public embarrassment and shame. The future careers of both men as public officials have been irreparably harmed. Additional punishment would serve no useful purpose.

## III

Not until he successfully completes his parole and is discharged may Gordon Walgren be reinstated into the bar of the State of Washington. In the meantime, however, Walgren may take the bar examination. If he passes the bar examination and if he has been discharged from parole, prior to this court's entry of an order reinstating Walgren to the bar, and pursuant to the documentation requirement provided for in APR 5(b), Walgren shall be required to submit to the Washington State Bar Association an affidavit stating he has satisfied the conditions of his parole, he has not engaged in illegal conduct involving moral turpitude, and he is of such good moral character as to warrant his reinstatement to the bar. The Bar Association then must certify to this court that Walgren is of good moral character and in all respects is qualified to engage in the

practice of law. *In re Bowden,* 99 Wn.2d 684, 689, 663 P.2d 1349 (1983). We note, and leave for resolution between the applicant and the Bar Association, the requirement of APR 5(b)(1) that the oath of attorney must be administered within 1 year from the date of the bar examination except for good cause shown.

We are mindful of the high degree of public interest in this case and the impact our decision will have both on the view the public might have of the legal system and on the future of the applicant, Gordon Walgren. The balancing of interests which must go into a decision concerning reinstatement are well spoken in the comments of one of the members of the Board of Governors of the Bar Association in voting in this case. After discussing the eight criteria listed in *In re Egger,* 93 Wn.2d 706, 611 P.2d 1260 (1980), the writer goes on to state:

> This brings us back to the three basic criteria: (1) The interest of the public; (2) justice to the legal system; and (3) fairness to the applicant.
>
> On the record it seems clear beyond any doubt that the interests of the public will not be impaired by reinstatement of Gordon Walgren. He will provide good, honest legal services.
>
> The issue of justice to the legal system is far more difficult. Because of Walgren's prominence there is a great tendency, as we can see from the newspaper editorials, to think that Walgren is being given special consideration that no one else would be given. I know that this is not the case. Nevertheless, the notoriety of this matter may have detrimental consequences for the profession. One might extend the period of disbarment to protect the standing of the profession. What this would really amount to would be that the rules would be applied most harshly to the prominent and more liberally to the unknown. This brings us to the next area of concern. The fairness to the applicant. Perhaps this should not be a consideration at all. Under the decisions of our Supreme Court this is, nevertheless, something we are to consider. In this case it is almost impossible to reconcile the concept of fairness to Walgren with the protection of the integrity and standing of the judicial system. Unless we

wait ten or fifteen years to deal with this matter, we cannot absolutely protect the integrity and standing of the system. That wait would not be absolutely fair to Gordon Walgren. Thus, we are compelled to weigh these factors. In doing that I am greatly influenced by the overwhelming evidence indicating that the interest of the public will be well served by reinstatement. Considerations of the interest of the public and fairness to the applicant outweigh the negative impact of reinstatement on the standing of the judicial system. I am compelled to vote for reinstatement.

The order of the Board of Governors is affirmed with the modifications contained herein.

UTTER, BRACHTENBACH, and PEARSON, JJ., and JAMES and WILLIAMS, JJ. Pro Tem., concur.

GOODLOE, J. (dissenting)—The majority holds that Gordon Walgren, subject to certain prerequisites and upon completion of his parole, may be reinstated as a member of the Washington State Bar. With this determination, I cannot agree.

I object because this court should not review a petition for reinstatement from a disbarred attorney still on parole and because a disbarred attorney, as a matter of law, cannot show rehabilitation until an adequate time has passed after completion of his parole.

No case was found where a court *approved* the reinstatement of a disbarred attorney while the disbarred attorney was still on parole. My reading of the majority opinion leads me to believe that it has preapproved Walgren's reinstatement subject to the following conditions: passing the bar examination; discharge from parole with accompanying restoration of his civil rights; submission of an affidavit by Walgren to the Bar Association; and certification from the Bar Association to this court. Majority opinion, at 572. Upon these prerequisites being met, this court will automatically reinstate Walgren as a member of the Washington State Bar.

My primary reason for objection is that this court requires a disbarred attorney to bear the substantial burden of proving rehabilitation. Walgren has not met this burden, nor can he, in my opinion, until an adequate time has passed after he has completed parole. This court has so held in the past. *In re Lonergan,* 23 Wn.2d 767, 162 P.2d 289 (1945).

In *Lonergan,* an attorney stipulated to disbarment after he was found guilty of federal mail fraud arising out of a speculative silver market operation. After serving 1½ years in prison, the attorney was released on parole for 2 years. One month *after* his parole expired, and with the considerable support of prominent members of the legal community, the attorney applied for reinstatement. This first petition was denied. The court explained its action.

> It [the first petition] was prematurely filed. It is universally held that one who has been disbarred—and one who has resigned in order to forestall disbarment is in the same position—should not be reinstated until sufficient time has elapsed to enable him to *actually demonstrate,* by conduct, that he is, *in fact,* worthy of trust and confidence. In effect, he is *expected, and required, to establish a new reputation.*

(Italics mine.) *Lonergan,* at 771.

Although no showing was attempted in *Lonergan,* as to the attorney's actions since disbarment, the court held such a showing "would have been *impossible*". (Italics mine.) *Lonergan,* at 771. The court explained:

> When he filed his resignation from the bar on October 3, 1938, the petitioner had already begun his term in prison. He was paroled on December 3, 1939, and remained a parolee until his sentence expired on June 16, 1941. He filed his first petition for reinstatement on July 14, 1941. Hence, during the period which elapsed between his resignation and the filing of his first petition for reinstatement, he was, *as to his conduct, under Federal regulation and compulsion for a period of two years and nine months, and a free agent with respect thereto but twenty-eight days.* This is *too short* a time in which to establish a *provable reputation* of being worthy of trust

and confidence. The first petition was premature, *unseemly so.*

(Italics mine.) *Lonergan,* at 772. Similarly, I find Walgren's petition premature, unseemly so. Walgren is currently under federal regulation and compulsion and will remain in this status until at least May 1986 and possibly until May 1987. Because in *Lonergan,* the attorney could not in fact prove rehabilitation upon the mere completion of parole, I do not know how the majority can hold Walgren has in fact proven rehabilitation when he only just recently *began* his parole.

The majority, after citing much of the *Lonergan* language but not applying any of it, states that

> *Lonergan* raises two issues which bear directly on Walgren's application for reinstatement. The first, considering the conduct for which Walgren was disbarred, is whether sufficient time has elapsed to establish, and whether he in fact has established, a "new reputation". The second is whether, as a matter of law, a disbarred attorney may be reinstated before he has successfully completed the terms of his parole.

Majority opinion, at 565–66.

The *Lonergan* court explicitly refused to consider the conduct for which the attorney was disbarred. Despite a report of an investigator adopted by the Board of Governors that the disbarred attorney's "transactions appeared in exact conformity to what is done every day in other commodity markets" and that the attorney was "made the goat . . . and . . . promptly and politely railroaded", the *Lonergan* court held that the question of guilt or innocence is "entirely irrelevant". *Lonergan,* at 770–71.

> When one has been disbarred on account of having been convicted of a crime applies for reinstatement, whatever opinions members of the court may hold as individuals as to his guilt or innocence is entirely irrelevant. In exercising their judicial functions, they must treat his guilt as an established fact.

*Lonergan,* at 771.

The *Lonergan* court explicitly answered in the negative

the issue of whether sufficient time could elapse to establish a new reputation when it determined that 28 days after parole, as a matter of law, is too short a time period in which to prove rehabilitation. This determination in turn implicitly answers in the negative the next question of whether an attorney could be reinstated while on parole. I find *Lonergan,* rather than raising the questions the majority suggests, dispositively answers those questions.

I also object to the majority's discussion of sufficiency of the punishment, under the circumstances presented. *In re Eddleman,* 77 Wn.2d 42, 44, 459 P.2d 387, 461 P.2d 9 (1969) lists eight criteria used to assess an attorney's readiness for reinstatement. Element (d) is described in part as "sufficiency of the punishment undergone in connection therewith". *Eddleman,* at 44. "[I]n connection therewith" refers back to element (c), which is "the nature and character of the charge for which he was disbarred". *Eddleman,* at 44. The nature and character of the charge for which Walgren was disbarred was his conviction under the RICO statute, 18 U.S.C. § 1962(c) (1982). The RICO statute requires an "enterprise" and two acts of "racketeering activity" within 10 years of each other in furtherance of the enterprise. *See* 18 U.S.C. § 1961(5) (1982). The enterprise element was Walgren's agreement with others to promote gambling legislation in Washington in exchange for a promise of a 6 percent share of profits in certain gambling related enterprises. *United States v. Bagnariol,* 665 F.2d 877, 881, 891 (9th Cir. 1981). The racketeering activity element was shown by violations of the mail fraud and travel act statutes, 18 U.S.C. §§ 1341, 1952(a)(3) (1982) respectively. *Bagnariol,* at 896–99. The conviction, in terms of this proceeding, evidenced an agreement to sell his vote, that is to say, an agreement to betray the public trust. There can be no question but this is a most serious offense.

At this point, Walgren has not even completed the punishment deemed necessary by the judicial system which determined his guilt. As noted by the majority, a release on parole provides, "the opportunity to prove" one's ability to

reintegrate into society and indicates one is "susceptible to rehabilitation". Majority opinion, at 570. Until Walgren has completed the punishment imposed on him by law, I believe it is presumptuous of Walgren to ask for reinstatement and for this court to grant it. At this point, the court cannot determine whether enough punishment has been imposed.

It is interesting that the majority should compare Walgren's punishment to the punishment in *In re Krogh,* 93 Wn.2d 504, 610 P.2d 1319 (1980). Majority opinion, at 572. The majority's description of the *Krogh* punishment omits critical textual and footnote material. The *Krogh* court stated:

> The punishment which Mr. Krogh has undergone includes, after his plea of guilty, the serving of time in prison *followed by a period of probation, the disabilities attached to his conviction,*[1] the loss of his government post, 6 years of disbarment, and the mental and emotional suffering attendant upon these penalties.

> [1]*We are assured that all such disabilities have now expired.*

(Italics mine.) *Krogh,* at 507. Because of these omissions, I do not find the cases to be analogous. A decision not to review Walgren's petition for reinstatement at this time is not a decision to impose additional punishment upon him. Rather, it is a recognition that Walgren has not yet completed the original punishment imposed for his crime.

Even though the attorney in *Krogh* had been disbarred for 6 years and his behavior in the interim had been found to be consistently honorable, Justice Wright felt "that a substantially longer period of time should be allowed to elapse to let him prove that he has rehabilitated himself before he is readmitted." *Krogh,* at 509 (Wright, J., dissenting). As noted by a commentator cited by the majority, "the most convincing evidence of rehabilitation is often the simple passage of time without transgressions." McChrystal, *A Structural Analysis of the Good Moral Character Requirement for Bar Admission,* 60 Notre Dame L. Rev.

67, 91 (1984). In my opinion, enough time has not passed. As explained by Justice Wright,

> The sanction of disbarment is one which is reserved for the most serious offenders among the legal profession. It is a sanction reserved for those who in the judgment of the Supreme Court are no longer fit to practice law; those who do not merit the confidence of the public; those whose continuation in the legal profession will constitute a menace to the public and a discredit to the honor of the profession. Some who have been disbarred are permitted at a later time to petition for reinstatement—many never do.

*Krogh,* at 509 (Wright, J., dissenting). Now is not the time for Walgren to petition for reinstatement.

My determination that it is currently too soon for Walgren to seek reinstatement does not mean that he can never be reinstated. This court has granted petitions for readmission from those who were originally denied readmission in several cases. *See In re Eddleman,* 79 Wn.2d 725, 489 P.2d 174 (1971) (second petition); *In re Simmons,* 81 Wn.2d 43, 499 P.2d 874 (1972) (second petition); *In re Lonergan,* 23 Wn.2d 767, 162 P.2d 289 (1945) (third petition).

CALLOW, J., concurs with GOODLOE, J.

DURHAM, J. (dissenting)—I agree with Justice Goodloe's dissent. However, one portion of the majority opinion deserves further comment. At page 568, the majority states:

> While his guilt is not to be contested and we do not cast doubt on the federal RICO conviction, we do not know with precision the extent to which Walgren was involved in the criminal enterprise. Our inability to comprehend the exact role of Gordon Walgren in this enterprise certainly does not exonerate his breach of the public trust. It does, however, constitute a mitigating circumstance which bears on the question of whether sufficient time has elapsed for rehabilitation. *See In re Krogh* [93 Wn.2d 504, 610 P.2d 1319 (1980)] at 506–07; *In re Cohen* [83 Ill. 2d 521, 416 N.E.2d 256 (1981)] at 526–27.

Neither the trial judge nor jury shared the majority's puzzlement. The Ninth Circuit expressed no confusion when it

found substantial evidence to support the verdict. *United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1981). Although every nuance of the crime may not be known, Walgren's agreement to sell his vote for 6 percent of the profits is painfully clear.

But the majority's myopia is not the main problem. Far more troubling is the holding that, because *the majority* cannot comprehend Walgren's precise involvement, he is entitled to mitigation regarding the period of his rehabilitation. That is a remarkable conclusion and one which is not borne out by any authority, including the two cases referred to by the majority. *In re Cohen,* 83 Ill. 2d 521, 416 N.E.2d 256 (1981) does not even address the majority's conclusion, let alone support it. *In re Krogh,* 93 Wn.2d 504, 610 P.2d 1319 (1980) noted *specific* mitigating factors of Krogh's involvement which indicated that "the weaknesses which led to the commission of the offense were correctable." *Krogh,* at 507. The facts of Krogh's involvement were clear.

It seems to me that one could more persuasively argue that not fully understanding a petitioner's criminal involvement would mitigate against leniency for fear of exculpating the guilty. Nonetheless, according to the majority, what we don't know, doesn't hurt Mr. Walgren.

GOODLOE, J., concurs with DURHAM, J.