**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

MARCH 5, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 5, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Disciplinary Proceeding Against | ) ) ) | No. 202,258-8 |
| STEPHEN KENNETH MONRO, | ) ) | En Banc |
| Attorney at Law, WSBA No. 26075. | ) ) | Filed: <u>March 5, 2026</u> |
| _____ | ) | |

YU, J.[*] — Disciplinary authorities recommended that attorney Stephen Kenneth Monro be disbarred for multiple instances of serious misconduct, including converting client funds, collecting unreasonable fees, and making false statements to his clients and the Office of Disciplinary Counsel (ODC). Monro argues that he is entitled to a new disciplinary hearing or, in the alternative, a lesser sanction of suspension. We impose the recommended sanction of disbarment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background is derived primarily from the findings of fact (or FOF) entered by the hearing officer and adopted by the Disciplinary Board (Board)

---

[*] Justice Mary Yu is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

of the Washington State Bar Association (WSBA). Unchallenged findings are "verities on appeal." *In re Disciplinary Proceeding Against Kelley*, 3 Wn.3d 541, 551, 553 P.3d 1101 (2024). Challenged findings "will be accepted as long as they are supported by substantial evidence," as discussed in the analysis below. *Id.*

A.     Background on Monro's law practice and the grievances against him

Monro was admitted to practice in Washington in 1996. He came to ODC's attention in late December 2016, when ODC received an overdraft notice regarding one of his "Interest on Lawyer's Trust Accounts" (trust account).

Monro maintained five bank accounts associated with his law practice. He had two accounts at KeyBank: a general account and a separate trust account for funds belonging to clients and third parties, which was the subject of the December 2016 overdraft notice. *See* RPC 1.15A(c). Monro also had three accounts at Opus Bank: a general account, a trust account he seldom used prior to ODC's involvement in January 2017, and an additional trust account opened in February 2017 for a specific client matter (estate of JK (Estate), discussed below). Monro was the only authorized signer on the trust accounts; he personally signed all checks, made all withdrawals, and determined the appropriateness of all deposits and disbursals.

Monro used a manual check register for his KeyBank trust account. However, from January 2016 to January 2017 (the year preceding the overdraft

notice), "the check register did not include all account transactions, a client matter for every transaction, and a balance after every transaction." Decision Papers (DP) at 62; *see* RPC 1.15B(a)(1). Monro asserts that his electronic client ledger contained the missing information. *See* RPC 1.15B(a)(2). However, his electronic records from this period were lost in a ransomware attack on December 5, 2016.

There is no indication that the ransomware attack removed any funds from Monro's accounts. Rather, his law firm's electronic records were encrypted and held for ransom, which he did not pay on the advice of the Federal Bureau of Investigation. Monro hired an expert who was able to recover many of the law firm's files, but the electronic records containing "current data" from "about a one year period" preceding the December 2016 ransomware attack were permanently lost. 6 Tr. of Proc. (Dec. 16, 2021) at 1033, 1036.

The hearing officer found the ransomware attack "was disruptive to the law firm, but there was no competent evidence that it caused or precipitated" Monro's misconduct, which he disputes. DP at 62. Nevertheless, it is undisputed that he continued using his KeyBank trust account after the ransomware attack without maintaining complete and contemporaneous records of his transactions. It is also undisputed that around the time of the attack, Monro "owed a substantial sum on behalf of clients whose funds he removed from trust," but he did not have enough

funds in his general accounts to pay the sums owed. *Id.* at 77. The hearing officer found that Monro knew he did not have sufficient funds, which he disputes.

As noted, Monro came to ODC's attention in late December 2016, about three weeks after the ransomware attack. On December 29, KeyBank sent ODC an overdraft notice regarding two checks that were presented against insufficient funds in Monro's trust account, although he argues the account balance "never went negative." Appellant's Opening Br. at 67.

On January 4, 2017, ODC opened a grievance and sent Monro a letter asking for his records and an explanation for the overdraft. Monro did not respond within 30 days, as ODC had requested. However, he took other actions within that time frame, including hiring a former WSBA auditor to reconstruct his records, depositing personal funds into his trust account, and paying a lien he had owed to the Department of Labor and Industries (L&I) since 2014 in connection with a client matter (TC's case, discussed below). The former WSBA auditor ultimately reconstructed Monro's KeyBank trust account records from January 1, 2016 to June 30, 2017 (the Hammond reconstruction).

After waiting more than 30 days and receiving no response from Monro, ODC sent a follow-up letter requesting a response and threatening discipline if he failed to comply. Attorney Leland Ripley subsequently appeared as Monro's counsel and stated that the overdraft occurred because Monro withdrew funds

"before the corresponding deposit(s) were 'made available by the bank.'" DP at 61. It is undisputed this statement was false; the overdraft was actually caused by "a shortage of client funds" in Monro's trust account. *Id.* However, Monro argues this false statement should not be attributed to him for disciplinary purposes.

Monro continued practicing law while ODC conducted its investigation. During this period, one of Monro's clients filed an additional grievance against him (JD, discussed below). The review committee consolidated the grievances and ordered a public hearing, which was held in December 2021. The hearing officer determined that Monro committed 14 counts of misconduct relating to his financial practices, recordkeeping, and candor. Monro challenges many of the hearing officer's findings, particularly as to his mental state. The findings are summarized here and addressed in more detail below.

B.      Summary of misconduct findings

The hearing officer found that Monro committed misconduct implicating six specific client matters—TC, SW, Estate of JK, JD, SA, and KF. The precise nature and degree of misconduct varies between clients, and Monro challenges findings pertaining to each one, as discussed below. Nevertheless, the findings indicate a consistent pattern, in which Monro removed funds from his trust account, failed to pay sums owed to his clients and third parties for extended periods, and, instead, used the funds for other purposes without entitlement. It is

undisputed that Monro repaid the funds before his disciplinary hearing. However, the hearing officer found that in most cases, Monro intended to deprive the rightful owners of the funds for some period of time, and that he occasionally attempted to conceal his actions through dishonesty to clients, third parties, and ODC. Monro challenges these findings.

The hearing officer also found that Monro made several improper transactions in the year preceding the ransomware attack, including depositing his wife's personal funds in his trust account in an effort to avoid paying taxes, and disbursing client funds to his mother and his law firm without entitlement. It is undisputed that Monro did not fully restore the clients' funds until after ODC opened its investigation, over a year later. However, he challenges the finding that he intended to deprive others of the funds for some time.

Finally, it is undisputed that in late December 2016, Monro "owed a substantial sum on behalf of [his] clients whose funds he removed from trust." *Id.* at 77. Moreover, between January 1, 2015 and January 31, 2017, "there were *no* days on which [he] had enough money in his general accounts to make payments on behalf of clients whose funds he had removed from trust." *Id.* (emphasis added). Yet, Monro asserts that "he was unaware of any insufficiency," and he challenges the hearing officer's findings that he used client funds without entitlement and intended to deprive the rightful owners of the funds. Appellant's

Opening Br. at 74. Monro also challenges findings that he disbursed over $53,000 to his law firm and his son (an attorney working for the firm) with no record of associated client matters, both before and after the ransomware attack.

C.     Procedural history following the disciplinary hearing

The hearing officer entered an amended decision in May 2022, which determined that Monro committed 14 counts of misconduct "by a clear preponderance of the evidence":

Count 1:  "[U]sing and converting client funds of SW, TC, KF, SA and the Estate of JK" in violation of RPC 1.15A(b); RPC 8.4(b), (c), and (i); and RCW 9A.56.020, .030, and .040.

Count 2:  "[F]ailing to deposit and maintain client funds in a trust account on multiple cases" in violation of RPC 1.15A(c).

Count 3:  "[F]ailing to promptly deliver funds to third persons, such as L&I liens in TC and SA's cases, which they were entitled to receive" in violation of RPC 1.15A(f) and 1.3.

Count 4:  "[U]sing client funds on behalf of another" and "disbursing funds in excess of the amounts clients had on deposit in multiple cases as demonstrated in [the Hammond] reconstruction" in violation of RPC 1.15A(h)(8).

Count 5:  "[F]ailing to provide KF and SA with a billing statement or written notice of his intent to withdraw earned fees" in violation of RPC 1.15A(h)(3) and 1.4.

Count 6:  "[F]ailing in contingent fee matters, including SA's matter, to provide clients with a written statement and/or an accurate written statement showing the outcome of the matter, including remittance to the client and the method of its determination" in violation of RPC 1.5(c), 1.4, and 8.4(c).

Count 7:  "[F]ailing to provide a written accounting after disbursing funds from trust in cases with SW, TC, KF and SA" in violation of RPC 1.15A(e).

Count 8:     "[C]harging and collecting an unreasonable fee in the Estate of JK and SA's matters" in violation of RPC 1.5(a).

Count 9:     "[C]omingling his mother's and wife's funds and his own funds with client funds in a trust account" in violation of RPC 1.15A(c) and (h).

Count 10:   "[F]ailing to maintain complete and current trust account records in multiple cases" in violation of RPC 1.15A(h)(2) and 1.15B.

Count 11:   "[M]aking misrepresentations to ODC during a grievance investigation, testifying falsely at his deposition, and fabricating a document in SA's case" in violation of RPC 8.4(b) and (c), RPC 8.1(a), and RCW 9A.72.040.

Count 12:   "[M]aking false statements to SA" and her spouse in violation of RPC 8.4(c) and 1.4.

Count 13:   "[M]aking false statements to a representative of L&I" in violation of RPC 4.1(a) and 8.4(c).

Count 14:   "[U]sing client funds owed to third persons such as in JD's case" in violation of RPC 1.15A(b) and (c)(1).

DP at 56, 87-89. The hearing officer further determined presumptive sanctions, considered aggravating and mitigating factors, and recommended disbarment.

The Board initially remanded to the hearing officer "to clarify the findings of fact and conclusions of law, and to consider the proportionality of the recommended sanction." *Id.* at 96. However, this court unanimously reversed on interlocutory review "because the hearing officer's findings and conclusions were adequate for appellate review" and "[w]e have never indicated that the hearing officer should consider proportionality." *In re Disciplinary Proceeding Against Monro*, 3 Wn.3d 733, 735, 741, 555 P.3d 845 (2024). On remand, the Board adopted the hearing officer's decision and disbarment recommendation by a 9-3

vote.  The dissenting Board members voted to propose a three-year suspension with two years' probation.

ODC subsequently filed a petition for interim suspension as required by ELC 7.2(a)(2).[1]  This court "unanimously determined that the petition should be granted."  Ord. on Pet. for Interim Suspension, *In re Disciplinary Proceeding Against Monro*, No. 202,250-2 (Wash. May 30, 2025).  The case is now before us for a decision on the merits.

ISSUES

A.     Does the "clear preponderance of the evidence" standard of proof in ELC 10.14(b) satisfy procedural due process?

B.     Is the hearing officer's decision adopted by the Board sufficient for meaningful appellate review?

C.     Are the challenged findings of fact supported by substantial evidence, and do the findings of fact support the conclusions of law?

D.     Is disbarment an excessive or disproportionate sanction?

---

[1] "When the Board enters a decision recommending disbarment, disciplinary counsel must file a petition for the respondent's suspension during the remainder of the proceedings." ELC 7.2(a)(2).  Monro suggests that disbarment is unwarranted because ODC did not seek interim suspension before the Board made its recommendation.  *See* Appellant's Opening Br. at 88 n.9.  As we recently reaffirmed, this argument is "'without merit.'" *In re Disciplinary Proceeding Against Wallstrom*, 4 Wn.3d 528, 559, 566 P.3d 104 (2025) (quoting *In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 197 n.9, 117 P.3d 1134 (2005)).

## ANALYSIS

A.    ELC 10.14(b)'s "clear preponderance of the evidence" standard properly imposes the intermediate burden of proof for attorney discipline cases

Monro's primary argument before this court pertains to the burden of proof for attorney discipline cases.  The applicable standard is set forth in ELC 10.14(b), which provides, "Disciplinary counsel has the burden of establishing an act of misconduct by a *clear preponderance of the evidence*."  (Emphasis added.)  Monro argues this standard is inadequate to satisfy procedural due process.  *See* U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3.  However, his argument rests on a misinterpretation of the "clear preponderance" standard.  In accordance with our precedent and well-established principles of court rule interpretation, we reaffirm that ELC 10.14(b) properly imposes the intermediate burden of proof for attorney discipline cases.  As a result, we reject Monro's due process challenge to the rule.

1.    This court has long recognized that allegations of attorney misconduct are subject to the intermediate standard of proof

Monro argues that attorney discipline cases require the intermediate standard of proof, which is less demanding than proof beyond a reasonable doubt but requires a greater quantity and quality of evidence than a mere preponderance.  We agree; this court has consistently applied the intermediate standard of proof in attorney discipline cases for over 100 years.

The burden of proof is an important procedural safeguard reflecting "'the degree of confidence'" the fact finder must have "'in the correctness of factual conclusions for a particular type of adjudication.'" *Nguyen v. Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 524, 29 P.3d 689 (2001) (internal quotation marks omitted) (quoting *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)). The necessary standard of proof depends on "the nature and importance of the interest subject to the potentially erroneous deprivation" and any relevant "important interests of the state." *Id.* at 524-25.

The lowest standard of proof, a "mere preponderance of the evidence," applies in civil cases for monetary damages between private parties, in which "society has a minimal concern." *Addington*, 441 U.S. at 423. By contrast, the highest standard of proof, "beyond a reasonable doubt," applies in criminal cases because "the interests of the defendant are of such magnitude" that the burden of proof must "exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* at 424, 423.

Falling between these lowest and highest standards is "[t]he intermediate standard, which usually employs some combination of the words 'clear,' 'cogent,' 'unequivocal,' and 'convincing.'" *Id.* at 424. This standard often applies in noncriminal cases involving "particularly important individual interests" or "allegations of fraud or some other quasi-criminal wrongdoing by the defendant."

*Id.* For example, this court has applied the intermediate standard to medical discipline and civil fraud cases, among others. *Nguyen*, 144 Wn.2d at 518; *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

This court has also long applied the intermediate standard of proof in attorney discipline cases. As early as 1921, we expressly "[r]ecogniz[ed] the serious consequences of the proceedings to the accused," and, as a result, we applied "the rule of law that the accusations should be proven by a *clear preponderance of the evidence*." *In re Disbarment of Sherrill*, 116 Wash. 143, 147, 198 P. 725 (1921) (emphasis added). We further expanded on the applicable standard in *In re Discipline of Little*, a 1952 attorney disciplinary case where the evidence was "in sharp conflict." 40 Wn.2d 421, 427, 244 P.2d 255 (1952).

In *Little*, this court recognized that "[a] matter such as this is always a serious one, and presents problems which are without complete analogy in the consideration of other legal proceedings." *Id.* at 430. Given the serious but unique nature of attorney discipline, we held that "[t]he privilege—and it is a privilege, not a right—to practice [law] cannot be lost to the practitioner upon slight evidence." *Id.* Instead, there must be proof by "a clear preponderance of the evidence that the acts charged have been done." *Id.* This standard affords a presumption that a licensed attorney will fulfill their "duty as an officer of the

court in accordance with [their] oath" but still recognizes that attorney discipline cases do not require proof beyond a reasonable doubt.[2] *Id.*

Following *Little*, we have found "no reason to change the burden" of proof for attorney discipline cases, "linguistically or otherwise." *In re Disciplinary Proceeding Against Burtch*, 162 Wn.2d 873, 895, 175 P.3d 1070 (2008). We have consistently reaffirmed that the intermediate standard properly balances "[t]he punitive nature of the proceedings . . . with the rights that must be extended to the attorney involved." *In re Disciplinary Proceeding Against Greenlee*, 82 Wn.2d 390, 393, 510 P.2d 1120 (1973). We have emphasized that the intermediate standard implicates both the quantity and the persuasive quality of the evidence, "requiring *greater certainty* than 'simple preponderance' but not to the extent required under 'beyond reasonable doubt'." *In re Disciplinary Proceeding Against Allotta*, 109 Wn.2d 787, 792, 748 P.2d 628 (1988) (emphasis added). We have also cited the intermediate standard for attorney discipline as persuasive authority in holding that the intermediate standard applies to medical discipline cases. *See Nguyen*, 144 Wn.2d at 529 (citing *Allotta*, 109 Wn.2d at 792).

---

[2] *Little* included a statement that "[e]very doubt should be resolved in [the respondent attorney's] favor." 40 Wn.2d at 430. We subsequently clarified this statement has "no vitality" to the extent that it suggests an extremely high "'beyond-*any*-doubt standard.'" *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 62, 93 P.3d 166 (2004).

Thus, in accordance with long-standing precedent, we reaffirm that the intermediate burden of proof applies to allegations of attorney misconduct.

> 2.    The "clear preponderance" standard in ELC 10.14(b) properly imposes the intermediate burden of proof

Despite the case law discussed above, Monro argues that the "clear preponderance" standard imposed by ELC 10.14(b) is not, in fact, an intermediate standard. In accordance with our precedent and well-established principles of court rule interpretation, we reaffirm that the "clear preponderance" standard in ELC 10.14(b) properly imposes the intermediate burden of proof.

Court rules are interpreted in the same manner as statutes. *In re Disciplinary Proceeding Against King*, 168 Wn.2d 888, 899, 232 P.3d 1095 (2010). We must give effect to ELC 10.14(b)'s plain language as an expression of the court's intent, without rendering "'any portion of it meaningless or superfluous.'" *In re Disciplinary Proceeding Against Wallstrom*, 4 Wn.3d 528, 559, 566 P.3d 104 (2025) (quoting *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 221, 504 P.3d 796 (2022)). The language must be interpreted in the context of existing law because the court is "presumed to know the law in the area." *Wynn v. Earin*, 163 Wn.2d 361, 371, 181 P.3d 806 (2008). In addition, we must interpret court rules to "avoid constitutional doubt" where possible. *Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 434, 341 P.3d 953 (2015). Court rule interpretation is a question of law reviewed de novo. *Id.* at 406.

As discussed, our precedent has long recognized that the intermediate standard of proof applies to attorney discipline cases and, for over 100 years, we have consistently described this standard as a "clear preponderance of the evidence." *E.g.*, *Sherrill*, 116 Wash. at 147 (1921); *Little*, 40 Wn.2d at 430 (1952); *Greenlee*, 82 Wn.2d at 393 (1973); *Wallstrom*, 4 Wn.3d at 542 (2025). We subsequently adopted this language in our court's procedural rules for attorney discipline. Former RLD 4.11(b) (1983). The same language now appears in our current procedural rules at ELC 10.14(b). Thus, for over a century, Washington precedent and court rules have consistently used the "clear preponderance" terminology to describe the intermediate burden of proof for attorney discipline cases. This terminology reflects the widespread practice of "employ[ing] some combination of the words 'clear,' 'cogent,' 'unequivocal,' and 'convincing'" to describe the intermediate burden of proof. *Addington*, 441 U.S. at 424.

Nevertheless, Monro argues that ELC 10.14(b) is insufficient because it does not include "[t]he word *convincing*." Appellant's Opening Br. at 18. In his interpretation, the "clear preponderance" standard "describes a *quantity* of evidence," but it "does not implicate the *quality* of that evidence." *Id.* at 17-18. To support this interpretation, Monro contends that the word "clear" does not "add meaningful weight to the longstanding and universal connotation of 'preponderance.'" *Id.* at 19. As a result, he reads the "clear preponderance"

15

standard as equivalent to a "'fair preponderance' standard . . . [which] fails the constitutional test." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)). However, Monro's reading of ELC 10.14(b) conflicts with our precedent and well-established principles of court rule interpretation.

First, Monro disregards the legal context in which ELC 10.14(b) was adopted. He insists that the "clear preponderance" standard is not commonly understood to impose the intermediate burden of proof and "lacks any such pedigree in the law." *Id.* at 20. To the contrary, over a century of Washington law has consistently used the "clear preponderance" language to describe the intermediate standard of proof in attorney discipline cases, as discussed above. We have repeatedly emphasized the important interests at stake for both the respondent attorney and the public, and we have expressly defined the "clear preponderance" standard in terms of "certainty," implicating both the quantity and the persuasive quality of the evidence. *Allotta*, 109 Wn.2d at 792. We must assume the court was aware of this precedent when it adopted the "clear preponderance" standard by court rule. *See Wynn*, 163 Wn.2d at 371.

Second, we interpret court rules to "avoid constitutional doubt," not to manufacture it. *Utter*, 182 Wn.2d at 434. Monro urges the court to adopt his interpretation for the express purpose of rendering ELC 10.14(b) unconstitutional.

We decline to do so. This court has always interpreted the "clear preponderance" standard to impose the intermediate burden of proof in attorney discipline cases, and there is no indication that the hearing officer or the Board misunderstood the well-established meaning of the standard in Monro's case.

Third, Monro's interpretation of the "clear preponderance" standard improperly reads the word "clear" out of the rule, rendering it "'meaningless or superfluous.'" *Wallstrom*, 4 Wn.3d at 559 (quoting *Kellogg*, 199 Wn.2d at 221). Indeed, he explicitly argues the word "clear" does not "add meaningful weight." Appellant's Opening Br. at 19. Monro supports his interpretation by citation to *Santosky*, a United States Supreme Court case that struck down a New York statute governing the burden of proof in actions to terminate parental rights. However, his reliance on *Santosky* is misplaced.

The statute in *Santosky* required proof by "a 'fair preponderance of the evidence.'" 455 U.S. at 747 (quoting N.Y. FAM. CT. ACT § 622 (McKinney 1975 & Supp. 1981-1982)). The New York Supreme Court, Appellate Division, held this standard was equivalent to "the preponderance of evidence standard" and was "proper and constitutional." *In re John AA.*, 75 A.D.2d 910, 910, 427 N.Y.S.2d 319 (1980). The United States Supreme Court reversed and held that "an intermediate standard of proof" was required due to the "'particularly important'"

private interests at stake. *Santosky*, 455 U.S. at 756 (quoting *Addington*, 441 U.S. at 424).

In doing so, *Santosky* contrasted New York's "'fair preponderance'" standard with the "*higher* standard[s] of proof" required by other jurisdictions, including South Dakota's "'*clear preponderance*' of the evidence" standard. *Id.* at 749-50 & n.3 (emphasis added) (citing *In re B.E.*, 287 N.W.2d 91, 96 (S.D. 1979)). Monro argues that *Santosky* misinterpreted South Dakota's standard, but that is irrelevant. *Santosky*'s analysis plainly shows that the "clear preponderance" standard can reasonably be interpreted to impose the intermediate standard of proof, as our court has consistently done in attorney discipline cases for over 100 years. Thus, we decline Monro's invitation to disregard the plain language of ELC 10.14(b) based on *Santosky*.

Finally, this court's opinion in *Burtch* unanimously rejected the respondent attorney's argument "that the burden of proof be changed to clear, cogent, and convincing evidence," as Monro argues here. 162 Wn.2d at 895. Monro contends that *Burtch* actually supports his argument by implying that the "clear preponderance" standard is "different" from the "clear, cogent, and convincing evidence" standard. Appellant's Reply Br. at 9 (emphasis omitted). To the contrary, *Burtch* did not acknowledge any substantive difference; our opinion

stated that there was "no reason to change the burden at this time, *linguistically* or otherwise." 162 Wn.2d at 895 (emphasis added).

Monro further argues that *Burtch* "says nothing about the constitutional due process issue presented here." Appellant's Reply Br. at 9. Yet, the attorney in *Burtch* expressly asserted a constitutional due process claim, arguing that because "the right to practice law is as important as a medical license," the same "clear, cogent, and convincing" standard should apply in both contexts. Br. of Appellant, *In re Disciplinary Proceeding Against Burtch*, No. 200,469-5, at 1 (Wash. 2007) (citing *Nguyen*, 144 Wn.2d 516; *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). By declining to rewrite the standard of proof, *Burtch* necessarily rejected the attorney's constitutional due process claim. Monro does not show that we should depart from *Burtch* at this time.

Thus, in accordance with our precedent and well-established principles of court rule interpretation, we reaffirm that ELC 10.14(b)'s "clear preponderance of the evidence" standard properly imposes the intermediate burden of proof in attorney disciplinary cases. As a result, Monro's due process challenge cannot succeed because it is based on a misinterpretation of the rule.

B.   We reaffirm that the hearing officer's decision is sufficient for meaningful appellate review

Next, Monro argues that the hearing officer's conclusions of law "are constitutionally inadequate for meaningful appellate review because they fail to

address each element" of the relevant RPCs and RCWs. Appellant's Opening Br. at 31. This court unanimously rejected a nearly identical argument in *Monro*. We adhere to our prior decision.

As noted above, *Monro* was before us on interlocutory review of the Board's order remanding for the hearing officer "to clarify unspecified findings and conclusions." 3 Wn.3d at 735. Monro argued the order was justified because the hearing officer's conclusions of law "cite several RPCs and statutes without reciting the text of the rules or statutes or their specific elements, they do not state which clients' cases involved what criminal conduct, and they do not identify the evidence in the record that supports each conclusion." *Id.* at 739-40. We rejected this argument because "nothing in the rules or our precedent requires a hearing officer's conclusions to contain any of that information." *Id.* at 740; *see* ELC 10.16(a); *In re Disciplinary Proceeding Against Johnson*, 114 Wn.2d 737, 745, 790 P.2d 1227 (1990).

Monro now reiterates many of the same points from *Monro* to argue that a hearing officer's conclusions of law in an attorney discipline case "should require the same level of specificity" as a trial court's conclusions in a criminal case. Appellant's Opening Br. at 35. We would not hesitate to revisit our prior decision if "justice would best be served" by doing so. RAP 2.5(c)(2). However, *Monro* correctly applied the standards set forth in *Johnson*, which Monro does not ask this

court to disavow. *Monro* also correctly recognized that attorney discipline cases are *not* subject to the same standards as criminal cases, nor are they "'in the nature of an appellate review as that term is generally understood.'" 3 Wn.2d at 739 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against McGlothlen*, 99 Wn.2d 515, 521, 663 P.2d 1330 (1983)). Instead, attorney discipline cases "'are sui generis hearings to determine if a lawyer's conduct should have an impact on the lawyer's license to practice law.'" *Id.* (quoting ELC 10.14(a)). *Monro* does not show any basis to revisit these holdings.

Monro further argues this court should adopt "a more robust standard . . . when allegations of criminal law violations are presented," such as the criminal theft allegations in this case. Appellant's Opening Br. at 51 (emphasis omitted). He contends that "neither the parties nor this Court have any idea whether the [hearing officer] who recommended disbarring Monro was aware of the elements of the crime of theft or the available defenses." *Id.* at 52. However, a hearing officer's conclusions of law are reviewed de novo. *Kelley*, 3 Wn.3d at 551. Thus, if a hearing officer is not "aware" of the applicable legal standards, this court will reject their erroneous conclusions. We decline to impose new requirements for a hearing officer's decision, and we reaffirm that the decision in this case is sufficient for meaningful review.

C.    The challenged findings of fact are overwhelmingly supported by substantial evidence, and the findings support the conclusions of law

Monro challenges numerous findings and conclusions in the hearing officer's decision adopted by the Board.[3]  As noted, unchallenged findings are treated as verities, challenged findings are reviewed for substantial evidence, and conclusions of law are reviewed de novo.  *Id.* at 550-51.  We hold the challenged findings are supported by substantial evidence except for harmless errors.  The findings, in turn, support the conclusions of law.

1.    We affirm the findings and conclusions pertaining to client TC (FOF 61, 89, 104, 105, 106, 107; counts 1, 2, 3, 7)

TC was injured on the job and received benefits from L&I.  Monro obtained two settlements on TC's behalf and agreed to reimburse L&I within 30 days of receiving each settlement check.

Monro deposited TC's first settlement check in 2011, but he did not pay L&I for over a year.  He deposited TC's second settlement check in 2014, but L&I was

---

[3] Monro also broadly criticizes the hearing officer's decision as "a cut-and-paste job" and a "wholesale adoption of the one-sided allegations" in the complaint.  Appellant's Opening Br. at 54-55.  It is not clear whether he intends to raise these criticisms as a separate issue for our review, but they are not well taken.  To the extent Monro intends to argue that the hearing officer's decision is insufficient for meaningful review, we adhere to *Monro*, as discussed.  If he intends to argue that this court should disregard the findings or reweigh the evidence because the hearing officer copied language from ODC's filings, we decline.  Monro cites no authority requiring a hearing officer to draft original language for their findings of fact, and ELC 10.16(b) expressly contemplates that the findings may be drafted by "one or both parties."  Finally, if Monro intends to argue that the hearing officer's decision is simply too erroneous to be reliable, he is incorrect, as discussed in this opinion.

not fully paid until January 2017, after ODC opened its investigation. These undisputed findings support the conclusion that Monro "fail[ed] to promptly deliver funds to third persons." DP at 88 (count 3). There is also substantial evidence that he "fail[ed] to provide a written accounting [to TC] after disbursing funds from trust" because TC eventually reached out to L&I for an itemized statement of the reimbursement payments. *Id.* (count 7); *see* Ex. A496.

After Monro deposited TC's second settlement check, his trust account should have held enough funds to pay L&I's reimbursement, but the balance quickly fell below that amount. In addition, Monro used funds from TC's settlement to make payments for unrelated client matters because he was no longer holding those clients' funds in trust.[4] These findings support the conclusion that Monro "fail[ed] to deposit and maintain client funds in a trust account on multiple cases." DP at 87 (count 2).

Approximately two years after Monro deposited TC's second settlement check, he began making installment payments toward L&I's reimbursement. ODC opened its grievance investigation a few months later, at which point the outstanding balance due to L&I was over $61,000. While ODC was waiting for

---

[4] Monro asserts these payments were made from the funds he was entitled to as attorney fees, "not from funds to which TC was entitled." Appellant's Opening Br. at 69 (challenging FOF 61, 89). This does not conflict with the findings, which are supported by substantial evidence including Monro's testimony that he "use[d] some of TC's money to fund the payment to Aetna" for an unrelated client (SW, discussed below). 5 Tr. of Proc. (Dec. 15, 2021) at 927.

Monro's response to its initial grievance letter, he wrote a check to L&I for the remaining balance. Monro did not have sufficient funds in his trust account to cover this check because he had already used TC's funds to benefit himself or others without entitlement.[5] However, he deposited sufficient personal funds to cover the check before it was processed.

The hearing officer found that Monro knew he did not have sufficient funds when he wrote the check to L&I, which he disputes. Appellant's Opening Br. at 69-70 (challenging FOF 105). However, this finding is supported by substantial evidence, such as Monro's testimony that he "became aware" TC's funds had been removed from trust "when [he] received the overdraft notice," which was at least a week before he wrote the check. 5 Tr. of Proc. (Dec. 15, 2021) at 927. Monro also disputes that he intended to deprive L&I of the funds for some period of time. Appellant's Opening Br. at 69-70 (challenging FOF 107). We accept the hearing officer's finding of intent because it is amply supported by reasonable inferences from the circumstances. *See In re Disciplinary Proceeding Against Placide*, 190 Wn.2d 402, 426, 414 P.3d 1124 (2018). These findings support the hearing

---

[5] Monro argues his "trust account balance" was sufficient and he never "inappropriately disbursed funds." Appellant's Opening Br. at 69-70 (challenging FOF 104, 106). However, regardless of Monro's *overall* trust account balance, the Hammond reconstruction shows that the balance *for TC* was negative $6,254.17 when he wrote the check to L&I. Protected Ex. A252, at 16. This is substantial evidence that Monro did not have sufficient funds, and it is reasonable to infer that he lacked the funds because he had used them for other purposes without entitlement.

officer's conclusion that Monro "us[ed] and convert[ed] client funds" belonging to TC.  DP at 87 (count 1).

Monro further argues the hearing officer's findings of "intent to deprive" (in TC's and other cases) are insufficient as a matter of law to support the criminal theft allegations in count 1.  According to Monro, the hearing officer was required to recite a specific phrase finding that he "had 'the objective or purpose to accomplish a result that constitutes a crime.'"  Appellant's Reply Br. at 30 (quoting *Placide*, 190 Wn.2d at 425); *see* RCW 9A.08.010(1)(a).  To the contrary, *Placide* holds that a hearing officer must "explicitly" find the necessary mental state, but it does not require the use of a specific phrase to do so.  190 Wn.2d at 426.  Here, the hearing officer explicitly found that Monro used funds he was not entitled to, and that he did so with the intent to deprive the rightful owners of the funds for some period of time.  That *is* an explicit finding that Monro had the objective or purpose to accomplish a result that constitutes a crime.  *See* RCW 9A.56.020(1) (defining theft).  Therefore, we hold the findings of intent are sufficient as a matter of law to support count 1.

2.  We affirm the findings and conclusions pertaining to client SW (FOF 40, 45, 47, 49, 53, 58, 59, 60; counts 1, 2, 7)

SW was injured in a motor vehicle accident and received insurance benefits administered by Aetna, subject to future reimbursement in accordance with ERISA, the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-

406, 88 Stat. 829. SW hired Monro, who obtained two settlements in 2011 and 2012. Aetna asserted that it was entitled "to full reimbursement without a reduction for attorney fees or costs," despite Monro's repeated requests to "discount" the reimbursement for his attorney fees. DP at 63-64.

Monro purports to challenge these findings, but he acknowledges that he disagreed with Aetna about its reimbursement. Appellant's Opening Br. at 65-66 (challenging FOF 40, 45, 47, 49). Instead, he argues the hearing officer "got the facts wrong" because Monro allegedly had a "good-faith belief" that he was not required to pay the reimbursement "unless Aetna provided the actual ERISA Master Plan." *Id.* at 65 (boldface omitted). Nevertheless, it is undisputed that instead of holding the funds until the dispute with Aetna was resolved, Monro removed "most if not all of SW's money" from trust. DP at 65.

After two years of demands, Aetna informed Monro that it was reversing payment for some of SW's benefits and, if he did not pay the reimbursement soon, it would sue SW and file a grievance against him. Four days later, Monro sent Aetna a reimbursement check.[6] In addition, he sent a letter "purporting to also be signed by SW" without her permission to conceal his failure to pay.[7] *Id.* These

---

[6] As discussed above, the hearing officer found that Monro funded this check using TC's settlement, which he disputes, but the finding is supported by substantial evidence.

[7] Monro challenges these findings, but they are supported by substantial evidence including SW's testimony at the disciplinary hearing. Appellant's Opening Br. at 65-66 (challenging FOF 53, 60); 2 Tr. of Proc. (Dec. 10, 2021) at 325-30.

findings support the conclusion that Monro "fail[ed] to provide a written accounting after disbursing funds from trust" in SW's case. *Id.* at 88 (count 7).

By the time Aetna was paid in 2014, Monro had already removed most or all of SW's funds from trust. Nevertheless, he challenges the findings that he used SW's funds for other purposes without entitlement and with intent to deprive third persons of the funds for some time, citing his alleged good-faith belief that Aetna was not entitled to full reimbursement. Appellant's Opening Br. at 65-66 (challenging FOF 58, 59). However, these findings are supported by substantial evidence and reasonable inferences from the circumstances.

SW testified that she never authorized Monro to "delay paying Aetna" or "to use the money that had been designated for Aetna for some other person or some other purpose." 2 Tr. of Proc. (Dec. 10, 2021) at 330. Thus, regardless of Monro's good-faith belief about *Aetna*'s entitlement to the funds, there is no indication that *anyone other than SW* was entitled to the funds. Yet, instead of holding the funds or disbursing them to SW, he removed the funds from trust. As a result, the record does not support Monro's alleged "claim of title made in good faith." RCW 9A.56.020(2)(a). Substantial evidence supports the hearing officer's findings, which support the conclusions that Monro "us[ed] and convert[ed] client funds" from SW and "fail[ed] to deposit and maintain client funds in a trust account on multiple cases." DP at 87 (counts 1, 2).

3.   We affirm the findings and conclusions pertaining to Estate of JK
(FOF 196, 208, 213, 214, 215, 217, 218, 221; counts 1, 8, 10)

JK was killed in a motor vehicle accident and died intestate. JK's sole heir

was a minor child with special needs.[8] Prior to hiring an attorney, JK's siblings

contacted the at-fault driver's insurer (Allstate) and received a settlement offer for

the policy limit of $100,000. However, Allstate wished to delay the settlement

until a personal representative could be appointed for the Estate of JK. JK's

brother subsequently hired Monro, and they entered a written agreement for both

contingent and hourly fees. To "investigate, negotiate, and/or litigate the Estate of

[JK]'s claims against Allstate, Dep[']t of Highways, . . . and all other entities,"

Monro would receive a 1/3 contingent fee, increasing to 40 percent if the claim

was "filed in court." Ex. A731, at 1. In addition, Monro would receive an hourly

fee of $375 "for all Probate Estate Work." *Id.*

JK's brother was appointed to administer the Estate, and Allstate issued a

check for $10,000 in personal injury benefits. Monro issued a settlement statement

that did not allocate any funds to the client, but allocated $4,000 (40 percent) to his

law firm for attorney fees. It is undisputed that the contingent fee should have

been only 1/3 because "[a]t that time, no lawsuit had been filed." DP at 81. This

---

[8] The hearing officer found that after JK's death, the child was "placed into dependent care." DP at 79 (FOF 196). Monro purports to challenge this finding but fails to substantively address it. In any event, this finding is supported by substantial evidence, including a letter Monro wrote to the attorney who represented JK's child in the dependency matter.

finding supports the hearing officer's conclusion that Monro "charg[ed] and collect[ed] an unreasonable fee" from the Estate of JK. *Id.* at 88 (count 8).

Monro filed a lawsuit against the at-fault driver in late January 2016, which settled in less than two months for the policy limit of $100,000, as Allstate had previously offered. Monro disputes that this lawsuit was filed unnecessarily to increase his contingent fee to 40 percent, but this finding is a reasonable inference based on the circumstances. Appellant's Opening Br. at 75 (challenging FOF 208). This finding further supports the conclusion that Monro collected an unreasonable fee from the Estate of JK (count 8).

Monro's initial statement for the distribution of the $100,000 settlement allocated $40,000 for attorney fees and $3,420 for costs, leaving a remaining balance of $56,580. However, between January and August 2016, he paid only $2,420 in costs and disbursed the remaining $107,580 to his law firm and his son, which "depleted the Estate, leaving no money for the minor child." DP at 82.

Monro testified that he "paid the $56,580 to [himself] initially as an hourly fee" to investigate additional claims, though he later determined no other claims were "viable."[9] 5 Tr. of Proc. (Dec. 15, 2021) at 880. Yet, the hearing officer

---

[9] Monro challenges the hearing officer's finding that "he kept no hourly fee records" for this investigation, arguing he kept electronic records that were lost in the ransomware attack. DP at 82 (FOF 213). However, the investigation of additional claims occurred in late 2015, and the expert Monro hired after the ransomware attack recovered some electronic records from that

found that Monro was entitled to "at most $54,000 in attorney fees" because his investigation into additional claims was "already covered in the contingent fee agreement." DP at 82 (FOF 214, 215). Monro argues that JK's brother agreed to "an hourly fee for legal services unrelated to the insurance payout." Appellant's Opening Br. at 60. However, the plain language of the written fee agreement states the contingent fee was to "*investigate*, negotiate, and/or litigate the Estate of [JK]'s claims against Allstate . . . and *all other entities*." Ex. A731, at 1 (emphasis added). The hourly fee was explicitly limited to "Probate Estate Work." *Id.*

Monro asserts that JK's brother understood he would be billed an hourly fee "for investigating other potential deep-pocket defendants," notwithstanding the written fee agreement to the contrary. Appellant's Opening Br. at 62. He relies on the report of an interview with JK's brother, which "[n]either the [hearing officer] nor the Board ever saw." *Id.* at 59. This report is not properly before us, as ELC 12.5(b) limits the record on review to the record before the Board and the hearing officer.[10] Moreover, the report does not require us to disregard the written fee

---

period. 5 Tr. of Proc. (Dec. 15, 2021) at 880; 6 Tr. of Proc. (Dec. 16, 2021) at 1031-36. Yet, Monro had *no* "time or billing records" and "*no* records of the work that [he] did." 5 Tr. of Proc. (Dec. 15, 2021) at 881 (emphasis added). This is substantial evidence supporting the hearing officer's finding, which supports the conclusion that Monro "fail[ed] to maintain complete and current trust account records in multiple cases." DP at 89 (count 10).

[10] Monro argues that because he filed the investigator's report in his interim suspension case, it should automatically be part of the record here, and he urges the court to disregard the different case numbers as "an inconsequential administrative choice by the Clerk of the Court." Appellant's Reply Br. at 42. We reject this view. The record presented for this court's review is determined in accordance with ELC 12.5(b), not the case number assigned by the clerk.

agreement, nor does the "failure of [an] injured client to complain" mitigate or erase attorney misconduct. ABA, ANNOTATED STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 9.4(f) (2d ed. 2019) (boldface omitted); *see also In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 763, 108 P.3d 761 (2005). Substantial evidence supports the hearing officer's findings, which support the conclusion that Monro collected an unreasonable fee from the Estate of JK. DP at 88 (count 8).

By the end of August 2016, Monro had disbursed all the settlement funds for the Estate of JK. The hearing officer found that he used the funds to benefit himself and others without entitlement, with the intent of depriving the Estate of the funds. Nevertheless, the hearing officer found that Monro "belatedly acknowledged" he had charged an "unfair" amount, which prompted him to open a trust account for the Estate of JK in early 2017. *Id.* at 83. Monro disputes these findings, relying heavily on the report of the interview with JK's brother, which is not properly before us as discussed above. He asserts he never collected unreasonable fees and his sole motivation in opening a trust account for the Estate of JK was "to provide additional financial assistance to [the child]." Appellant's Opening Br. at 75 (challenging FOF 217, 218, 221).

The hearing officer's findings are supported by substantial evidence. As discussed, Monro took fees from the Estate of JK in violation of the written fee

agreement. He ultimately repaid the Estate using a separate trust account, but he did not open this account until ODC opened its grievance investigation, months after he depleted the Estate's settlement funds. The subsequent declaration of completion for JK's probate case increased the child's share from $0 to $72,550. These circumstances support the hearing officer's findings, which support the conclusions that Monro "us[ed] and convert[ed] client funds" and collected an unreasonable fee from the Estate of JK. DP at 87-88 (counts 1, 8).

> 4. We affirm the findings and conclusions pertaining to client JD (FOF 258; counts 2, 14)

JD was injured in a motor vehicle accident and hired Monro to represent her. Monro filed suit against the at-fault driver in October 2016. In February 2018, while ODC's grievance investigation was ongoing, Monro settled JD's case and deposited the settlement in his trust account. JD and Monro exchanged e-mails regarding the distribution of the settlement funds, and she filed a grievance against him. This was later consolidated with ODC's grievance, as noted above.

On February 22, 2018, the day after depositing JD's settlement funds, Monro disbursed $1,692.16 to his law firm for alleged advanced costs. It is undisputed that he did not, in fact, fully pay the costs until July 2018, and that he was not entitled to the excess funds. Monro challenges the finding that he used the funds to benefit himself or others, asserting that he "did not intentionally use any of the funds during this period for his own or any third person's benefit."

Appellant's Opening Br. at 77 (challenging FOF 258). However, the challenged finding does not say he acted intentionally, and it is reasonable to infer that Monro used the funds to benefit himself or others. These findings support the conclusions that Monro failed to "maintain client funds in a trust account" and "us[ed] client funds owed to third persons." DP at 87, 89 (counts 2, 14).

> 5.  We affirm the findings and conclusions pertaining to client KF (FOF 115, 116, 117; counts 1, 5, 7)

In May 2016, Monro deposited a $50,000 settlement for KF into his KeyBank trust account. By August 2016, Monro had disbursed all of KF's funds, including $38,400.86 for his law firm and his son. Later, from June 2017 to June 2018, Monro disbursed about $13,000 related to KF's case while ODC's grievance investigation was ongoing. He disbursed these funds from a general account because he was no longer holding any funds in trust for KF. The hearing officer found that Monro had disbursed at least $13,000 in excess funds to his law firm and his son without entitlement, and that he used the funds to benefit himself or others with the intent to deprive KF or others of the funds for some time.

Monro challenges these findings and argues that the disbursements were properly made "to pay third parties for costs." Appellant's Opening Br. at 70 (challenging FOF 115, 116, 117). However, he withdrew the funds long before paying the costs. KF testified she did not authorize him to withdraw the funds in advance or delay payment to the third parties and she was not aware that he had

done so. 4 Tr. of Proc. (Dec. 14, 2021) at 598-604. This is substantial evidence

supporting the findings, which support the conclusions that Monro "us[ed] and

convert[ed] client funds," failed to provide "a billing statement or written notice of

his intent to withdraw earned fees," and "fail[ed] to provide a written accounting

after disbursing funds from trust" in KF's case. DP at 87-88 (counts 1, 5, 7).

> 6.  We affirm the findings and conclusions pertaining to client SA except
> for harmless errors (FOF 132, 134, 138, 140, 149, 150, 160, 164, 165,
> 168, 171, 235, 240, 241, 242, 243, 244, 247; counts 1, 2, 3, 5, 6, 7, 8,
> 11, 12, 13)

SA's case is the most complicated and involves the highest number of

ethical violations. SA was injured on the job in 2014 and received L&I benefits

for two years. When L&I determined SA was able to return to work, she hired

Monro. On December 2, 2016, Monro and SA entered a written fee agreement to

pursue a personal injury claim for a 1/3 contingency fee, increasing to 40 percent if

the case was filed in court. As discussed, Monro's electronic records were hit with

a ransomware attack a few days later, on December 5, and ODC opened its

grievance investigation the following January.

Monro filed a personal injury complaint on behalf of SA in May 2017.

Shortly thereafter, he settled with the at-fault driver's insurer for $100,000 and

with SA's insurer for an additional $185,000. Both settlements were deposited in

Monro's trust account by July 3, 2017.[11]  Per the written fee agreement, Monro was entitled to only $114,000 in attorney fees, but he disbursed $164,882.30 to his law firm in July 2017.  It is undisputed that he did not provide prior written notice of the disbursal to SA and that he used SA's settlement to benefit himself or others without entitlement.  These unchallenged findings support the conclusion that Monro failed to provide "a billing statement or written notice of his intent to withdraw earned fees."  DP at 88 (count 5).

Nevertheless, Monro challenges the findings that he intended to deprive others of the funds and that he did not promptly deliver the excess funds to SA.  *Id.* at 73, 77 (FOF 138, 168).  He argues that he merely intended to hold the excess funds in his general account "to fund future disbursements to L&I and a possible forensic examination."  Appellant's Opening Br. at 70.  However, the hearing officer's findings are supported by reasonable inferences from the circumstances.  Indeed, as ODC points out, there are no records indicating Monro "was keeping track of SA's funds in the general account."  Answering Br. of ODC at 25.  The findings support the conclusions that Monro "us[ed] and convert[ed] client funds" and failed "to maintain client funds in a trust account."   DP at 87 (counts 1, 2).

---

[11] Monro argues, and ODC concedes, that the hearing officer incorrectly transposed the dates on which the settlements were deposited.  *See* DP at 73 (FOF 132, 134).  However, the error is harmless, as the deposits were separated by only a few days with no intervening events.

Monro also challenges the finding that he failed to provide SA with a written accounting after disbursing the funds to his law firm in July 2017, pointing to a settlement statement SA signed in August 2017. Appellant's Opening Br. at 71 (challenging FOF 140). This finding is supported by substantial evidence because the information in the August 2017 settlement statement was false.

Monro provided the August 2017 statement to SA one day after L&I issued an order and notice for reimbursement of $26,000. Among other items, the August 2017 statement listed Monro's attorney fees as $114,000 (about $50,000 less than the amount already disbursed) and L&I's reimbursement as $39,825 ($13,825 more than L&I's order and notice stated). The balance to SA was listed as $120,000. SA signed the August 2017 statement and accepted a $120,000 check from Monro, which left only $117.70 of her settlement in his trust account. He issued a check to SA for the final $117.70 in March 2018.

Before signing the August 2017 statement, SA asked about the discrepancy in the reimbursement due to L&I, as well as a $10,000 forensic fee that had not been incurred yet. The hearing officer found that Monro told SA he was planning to "hold back" these excess fees for distribution at a later date, which was false.[12] DP at 75 (FOF 149, 150). These findings support the conclusions that Monro

---

[12] Monro challenges these findings, but they are supported by substantial evidence including SA's testimony at the hearing. 3 Tr. of Proc. (Dec. 13, 2021) at 446-47, 489.

failed to provide "an accurate written statement," "fail[ed] to provide a written accounting after disbursing funds from trust," "collect[ed] an unreasonable fee," and made "false statements to SA." *Id.* at 88-89 (counts 6, 7, 8, 12).

L&I's order and notice for reimbursement became final in October 2017. However, Monro did not start making installment payments until January 2018, following multiple calls from L&I. These undisputed findings support the conclusion that Monro "fail[ed] to promptly deliver funds to third persons." *Id.* at 88 (count 3); *see also Monro,* 3 Wn.3d at 740. When L&I asked why Monro was making installment payments instead of paying a lump sum, he stated that SA was out of the country and he was waiting for her to authorize disbursal. This statement was false because SA had already authorized payment to L&I, which supports the conclusion that Monro made "false statements to a representative of L&I."[13] DP at 89 (count 13).

As L&I had previously asked, ODC investigators asked Monro "why he was making installment payments towards L&I's lien, instead of paying a lump sum." *Id.* at 76. The hearing officer found that Monro falsely stated it was "to 'safeguard the client,'" but his true intent was to deprive others of the funds. *Id.* at 76-77.

---

[13] Monro argues this finding is "clearly incorrect" because he received an e-mail from SA shortly before she left the country, which "does not mention L&I." Appellant's Opening Br. at 72 (emphasis omitted) (challenging FOF 160). This is immaterial. SA had already signed the August 2017 settlement statement, which allocated (excessive) funds for L&I's reimbursement and stated, "I authorize my attorney to disburse the funds as set forth above." Ex. A669.

Monro disputes these findings, arguing he "hoped that L&I would compromise the total amount due" if he delayed payment. Appellant's Opening Br. at 73 (challenging FOF 164, 165, 171). However, L&I's order and notice was final for months before Monro started making payments, causing the lien to accrue interest without SA's knowledge. Monro subsequently paid the balance due to L&I only three days after ODC asked him about it. These circumstances support the findings, which support the conclusions that Monro "us[ed] and convert[ed] client funds," "fail[ed] to promptly deliver funds to third persons," and made "misrepresentations to ODC during a grievance investigation." DP at 87-89 (counts 1, 3, 11).

On July 13, 2018, ODC requested Monro's client file for SA. Three days later, Monro had SA sign the second page of a document acknowledging she had received checks for $120,000 and $117.70, as noted above.[14] It is undisputed that Monro did not disclose "the *first* page of the document" to SA, which was a settlement statement that "differed in several ways from the settlement statement signed by SA one year earlier," in August 2017. *Id.* at 75 (emphasis added), 85. As compared to the August 2017 statement, the July 2018 statement included

---

[14] Monro challenges the finding that the second page "appeared to contain SA's signature." DP at 86 (FOF 240). ODC concedes that he is "correct to the extent that SA signed the second page." Answering Br. of ODC at 48. However, this was harmless because the next finding expressly recognizes that "SA signed the second page." DP at 86 (FOF 241).

excess attorney fees for L&I benefits that SA had received before hiring Monro.

Monro provided ODC with the July 2018 statement, but not the August 2017

statement. Conversely, Monro provided SA with the August 2017 statement, but

she did not see the first page of the July 2018 statement at the time of signing, and

Monro did not provide it her.

The hearing officer found that Monro was attempting to "cover up the fact"

that the July 2018 statement included fees he was not entitled to. *Id.* at 86 (FOF

247). Monro "knew that SA did not sign or know about the 2018 settlement

statement when he provided it to ODC," and he falsely testified in deposition that

he had "provided the 2018 settlement statement to SA." *Id.* (FOF 242, 243, 244).

Monro disputes these findings, but he does not dispute that he convinced his client,

SA, to sign the second page of a document without showing her the first page.[15]

He then provided ODC with the July 2018 statement SA unwittingly signed and

failed to provide the August 2017 statement she knowingly signed. These

circumstances amply support the hearing officer's findings, which support the

conclusions that Monro made "misrepresentations to ODC during a grievance

---

[15] Monro challenges the finding that SA did not see the first page of the July 2018 statement "until preparing for this hearing." DP at 86 (FOF 241). He argues that she did not see the first page of the document until she was testifying "on the stand." Appellant's Opening Br. at 76. This distinction is irrelevant.

investigation, testif[ied] falsely at his deposition, and fabricat[ed] a document in SA's case," and made "false statements to SA." *Id.* at 89 (counts 11, 12).

Monro also sent ODC two fee agreements for SA's case: the true agreement she signed in December 2016 and a false agreement "purport[ing] to contain SA's initials on the first page."[16] *Id.* at 84. It is undisputed that the false agreement was a forgery; Monro or "someone in his office wrote SA's initials on that first page without her permission," attached "the falsely initialed first page" to the second page of the true fee agreement, and sent it to L&I. *Id.* at 84-85. These findings support the conclusions that Monro "fabricat[ed] a document in SA's case" and made "false statements to a representative of L&I." *Id.* at 89 (counts 11, 13).

In sum, the findings of fact pertaining to specific client matters are supported by substantial evidence except for harmless errors, and the findings support the conclusions of law. However, Monro also challenges numerous findings and conclusions that are not client-specific.

---

[16] Monro argues, and ODC concedes, that the exhibit cited by the hearing officer for the false fee agreement (Ex. A652) was not admitted at the hearing. Appellant's Opening Br. at 76 (challenging FOF 235); Answering Br. of ODC at 47. This error is harmless because the same false fee agreement appears in admitted exhibit A665, at 4-5.

7.      We affirm the findings and conclusions that are not client-specific (FOF 12, 14, 21, 22, 24, 25, 27, 30, 34, 169, 170, 171, 174, 188; counts 2, 4, 9, 10)

a.      FOF 12, 14, 21, 22

As noted, Monro came to ODC's attention when his bank sent an overdraft notice regarding his trust account. Monro challenges these findings, arguing "the account balance never went negative." Appellant's Opening Br. at 67 (challenging FOF 12, 14). However, the overdraft notice in the record states the *available* balance was negative, which is substantial evidence supporting the findings.

When ODC asked Monro for information about the overdraft notice, his counsel (attorney Ripley) falsely responded that the overdraft occurred because the funds were withdrawn "before the corresponding deposit(s) were 'made available by the bank.'" DP at 61. Monro argues the hearing officer wrongfully "attributed" this false statement to him. Appellant's Opening Br. at 67 (challenging FOF 21, 22). To the contrary, the hearing officer expressly found the statement was made "through counsel," not by Monro personally. DP at 61.

Monro also argues that the hearing officer erred as a matter of law by relying on attorney Ripley's false statement to conclude "that Monro had lied to ODC during its investigation, warranting the disbarment sanction." Appellant's Opening Br. at 57. However, as ODC points out, "there are other findings of more serious misrepresentations directly attributable" to Monro, specifically in SA's case,

discussed above. Answering Br. of ODC at 45. Moreover, the hearing officer cited SA's case, not attorney Ripley's false statement, to conclude that Monro's false statements to ODC warranted a presumptive sanction of disbarment. DP at 92-93. We therefore reject Monro's argument on this point.

        b.     FOF 24, 25, 27; count 10

As discussed, Monro used a manual check register for his KeyBank trust account. It is undisputed that from January 2016 to January 2017, "the check register did not include all account transactions, a client matter for every transaction, and a balance after every transaction." *Id.* at 62. Nevertheless, Monro argues these findings "are misleading by omission" because they do not mention his electronic client ledger, which allegedly contained the missing information but was "lost to the cyberattack." Appellant's Opening Br. at 68, 67. He also disputes the finding that "there was no competent evidence" the ransomware attack "caused or precipitated" any of his misconduct. DP at 62.

There is nothing misleading about the hearing officer's findings because, as ODC points out, "a client ledger is a separate record from a check register, and there are separate rules governing each." Answering Br. of ODC at 55 (citing RPC 1.15B(a)(1), (2)). Regardless of Monro's client ledger, his undisputed failure to maintain his check register supports the conclusion that he "fail[ed] to maintain complete and current trust account records in multiple cases." DP at 89 (count 10).

Moreover, although Monro asserts the ransomware attack caused him significant "anguish" and made it "a monumental struggle" to reconstruct his trust account records, he does not show that it caused or precipitated his misconduct. Appellant's Opening Br. at 68. To the extent Monro argues the ransomware attack should be treated as a mitigating circumstance, that issue is addressed below.

   c.   FOF 30 and 34; counts 2, 10

The hearing officer found that after the ransomware attack, Monro disbursed over $19,000 from his trust account to his law firm and his son without recording associated client matters. Monro argues that "[w]ithout a specific timeframe . . . the relevant transactions cannot be identified." *Id.* (challenging FOF 30). However, the Hammond reconstruction includes a ledger of "unknown" disbursals with no associated client matters. Eight "unknown" disbursals totaling $19,265.04 were made to Monro's law firm and his son after the ransomware attack, between December 15, 2016, and January 4, 2017.[17] This is substantial evidence supporting the finding, which supports the conclusions that Monro failed to "maintain client funds in a trust account" and "fail[ed] to maintain complete and current trust account records." DP at 87, 89 (counts 2, 10).

---

[17] Monro purports to challenge the finding that he "was unable to identify client matters" associated with disbursals of $34,000 to his law firm and his son prior to the ransomware attack, but he does not include any argument. DP at 63 (FOF 34); *see* Appellant's Opening Br. at 68. Regardless, this finding is also supported by the Hammond reconstruction's "unknown" ledger.

d.      FOF 169, 170, 171, 174; count 4

Next, Monro disputes that on "multiple occasions," he disbursed funds from his trust account, failed to pay "outstanding costs and/or subrogated interest" owed on behalf of his clients, and, instead, used the funds to benefit himself and others without entitlement. *Id.* at 77. Monro argues these findings should be rejected as "non-specific" because they do not include "identifying information regarding clients, dates, and amounts." Appellant's Opening Br. at 74.

The hearing officer's findings are supported by the Hammond reconstruction and the findings pertaining to several specific client matters, such as KF's and JD's cases, discussed above. Moreover, ODC's analysis shows that when the overdraft notice was issued, Monro owed more than $236,000 on behalf of clients whose funds he had removed from trust, yet his general accounts contained less than $6,000. This analysis is consistent with the undisputed finding that between January 1, 2015, and January 31, 2017, "there were no days on which [Monro] had enough money in his general accounts to make payments on behalf of clients whose funds he had removed from trust." DP at 77.

Thus, substantial evidence supports the hearing officer's findings, which support the conclusion that Monro "us[ed] client funds on behalf of another" and

"disburs[ed] funds in excess of the amounts clients had on deposit in multiple cases."[18]  *Id.* at 88 (count 4).

e.      FOF 188; count 9

Finally, as discussed, Monro deposited his wife's personal funds into his trust account in an effort to avoid paying taxes.  He subsequently disbursed $50,000 more than he had deposited, using client funds to benefit himself and his family.  Yet, Monro challenges the finding that he intended to deprive others of the funds for some time, arguing he "was unaware that this account was underfunded." Appellant's Opening Br. at 74 (challenging FOF 188).

The excess disbursals occurred in March and April 2016, long before Monro lost any records in the ransomware attack.  Moreover, these disbursals occurred around the same time as several tax levies were served on Monro's bank.  His intent can reasonably be inferred from these circumstances, and the findings amply support the conclusion that Monro commingled "his mother's and wife's funds and his own funds with client funds in a trust account."  DP at 88 (count 9).

In sum, we hold that the hearing officer's findings adopted by the Board are supported by substantial evidence, with the exception of harmless errors.  The

---

[18] Monro argues that "he was unaware of any insufficiency of funds." Appellant's Opening Br. at 74 (challenging FOF 174).  His knowledge is a reasonable inference based on the circumstances, including the extreme shortage of funds in his general accounts and the fact that he incurred thousands of dollars in overdraft fees during the relevant time period.

findings support the conclusions that Monro committed 14 counts of misconduct affecting his clients, third parties, and ODC's investigation.

D.      We adopt the Board's disbarment recommendation

Finally, Monro argues that disbarment is a disproportionate and excessive sanction. We follow a three-stage analysis to review the Board's recommended sanction in accordance with the ABA *Standards*: "(1) 'evaluate whether the Board properly determined the presumptive sanction,' (2) 'determine whether any aggravating or mitigating circumstances call for a departure from the presumptive sanction,' and (3) consider 'proportionality of the sanction' and 'the extent of agreement among the members of the Disciplinary Board.'" *Wallstrom*, 4 Wn.3d at 543 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 18, 232 P.3d 1118 (2010)). We adopt the Board's recommended sanction of disbarment.

1.      It is undisputed that the presumptive sanction is disbarment

To determine the appropriate sanction "[w]hen multiple ethical violations are found, the 'ultimate sanction imposed should at least be consistent with the sanction for the most serious instance.'" *Kelley*, 3 Wn.3d at 552 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Petersen*, 120 Wn.2d 833, 854, 846 P.2d 1330 (1993)). Aside from the challenges to the findings and conclusions discussed above, it is undisputed that disbarment is the

presumptive sanction for Monro's most serious ethical violations, including knowingly and intentionally using and converting client funds, collecting fees in excess of his written agreements, dishonesty to client SA, and dishonesty to ODC during its grievance investigation. *See* ABA STANDARDS stds. 4.11, 4.61, 5.11, 7.1.

2.      Monro does not show extraordinary mitigation

The second step is to consider aggravating and mitigating factors. Monro does not challenge the five aggravators found by the hearing officer: dishonest or selfish motive, pattern of misconduct, multiple offenses, refusal to acknowledge wrongful nature of his conduct, and substantial experience in the practice of law. DP at 93. However, he argues that the hearing officer and the Board should have given more weight to his asserted mitigating factors. We cannot agree.

Where an attorney converts client funds, "'only extraordinary mitigation' will justify a lesser sanction" than disbarment. *Wallstrom*, 4 Wn.3d at 543 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Fossedal*, 189 Wn.2d 222, 234, 399 P.3d 1169 (2017)). Monro suggests this standard should not apply because, in his view, "no client of Monro lost money at any time; nor did Monro intend to permanently deprive any client or third parties of their money." Appellant's Opening Br. at 81. To the contrary, theft by embezzlement "does *not* require an intent to permanently deprive." *Schwimmer*, 153 Wn.2d at 760 (emphasis added). Moreover, as this court recently reaffirmed,

"[t]he funds in an attorney's trust account do not belong to the attorney. For that reason, it is both unethical and potentially criminal for an attorney to use their trust account as a 'piggy bank' to cover business or personal expenses." *Wallstrom*, 4 Wn.3d at 531.

Thus, when an attorney converts client funds without entitlement, the client *has* "lost" money at that time, regardless of whether the attorney intends to "permanently" retain the funds. *Contra* Appellant's Opening Br. at 81. Indeed, "[e]ven if an attorney reimburses the client for misappropriated funds, the repayment does not eviscerate [their] ethical violation." *Schwimmer*, 153 Wn.2d at 761. Because Monro's misconduct includes knowing and intentional conversion of client funds, "the presumptive sanction of disbarment must be imposed 'absent extraordinary mitigating circumstances.'" *Wallstrom*, 4 Wn.3d at 553 (quoting *In re Rentel*, 107 Wn.2d 276, 286, 729 P.2d 615 (1986)).

Monro argues his sanction should be mitigated due to (1) lack of a prior disciplinary record, (2) "'personal and emotional'" problems caused by the ransomware attack, and (3) his "successful efforts at rehabilitating his practices and procedures." Appellant's Opening Br. at 84, 86. The hearing officer found that the absence of a prior disciplinary record was mitigating, but did not warrant a lesser sanction, and rejected Monro's reliance on personal and emotional problems

as a mitigator. We agree with the hearing officer's assessment, and we decline to consider Monro's alleged rehabilitation following the disciplinary hearing.

Monro's lack of a prior disciplinary record is not extraordinary mitigation because "an attorney cannot shield [themselves] from the consequences of committing a serious ethical violation simply because it is [their] first offense." *Schwimmer*, 153 Wn.2d at 763. In addition, although the ransomware attack was certainly a challenging circumstance, much of Monro's misconduct occurred before the attack, as detailed above. He does not show a "connection" between his serious misconduct *predating* the ransomware attack and the personal and emotional problems that were later *caused by* the ransomware attack. *In re Disciplinary Proceeding Against Poole*, 164 Wn.2d 710, 733, 193 P.3d 1064 (2008). Without such a "demonstrated connection," Monro's asserted personal and emotional problems cannot establish extraordinary mitigation. *In re Disciplinary Proceeding Against Christopher*, 153 Wn.2d 669, 684, 105 P.3d 976 (2005).

Finally, Monro argues that he should not be disbarred because he made "successful efforts at rehabilitating his practices and procedures following the ransomware attack."[19] Appellant's Opening Br. at 86. There was no need for

---

[19] Monro suggests that his alleged rehabilitation shows "remorse," but he continues to deny his most serious ethical violations and acknowledges only that his "trust accounting was deficient" in the past. Appellant's Opening Br. at 88, 87. Monro's intentional conversion of funds, dishonesty to his clients, and misrepresentations to ODC were not caused by deficient trust accounting practices. As a result, remorse is not an applicable mitigator in this case.

Monro to wait for a catastrophic event like the ransomware attack before rehabilitating his practices and procedures, and the fact that he did so is not extraordinary mitigation. Moreover, "interim rehabilitation" has not been recognized as an "independent factor" in mitigation since 1992. *In re Disciplinary Proceeding Against Perez-Pena*, 161 Wn.2d 820, 835, 168 P.3d 408 (2007). Thus, we decline to mitigate Monro's sanction based on his claimed rehabilitation after the ransomware attack.

Monro also urges the court to consider his alleged rehabilitation following his disciplinary hearing, citing evidence from his interim suspension case. We decline; as noted above, the record before this court is limited to the record that was presented to the hearing officer and the Board. ELC 12.5(b). Moreover, as this court has long recognized, "[e]nding misconduct does not erase . . . that misconduct which has already occurred. Even where an attorney has been rehabilitated prior to the imposition of discipline, 'the legal system itself has not been redeemed.'" *In re Disciplinary Proceedings Against Dann*, 136 Wn.2d 67, 83-84, 960 P.2d 416 (1998) (quoting *In re Disciplinary Proceeding Against Kennedy*, 97 Wn.2d 719, 723, 649 P.2d 110 (1982)).

Thus, Monro's alleged rehabilitation following his disciplinary hearing is not relevant to our inquiry at this stage of the proceedings. Instead, "reformation subsequent to disbarment" may be addressed in a future petition for reinstatement,

in which "[t]he major consideration" will be Monro's "burden of demonstrating that he has overcome the weaknesses producing his earlier misconduct." APR 25.5(b)(5); *In re Disciplinary Proceeding Against Walgren*, 104 Wn.2d 557, 561, 708 P.2d 380 (1985); *In re Disciplinary Proceeding Against Hart*, 118 Wn.2d 280, 286, 822 P.2d 264 (1992).

3.       Monro fails to show disproportionality

The final step of our analysis is to consider unanimity and proportionality.[20] Although the Board's decision was not unanimous, "a lack of unanimity does not conclusively vitiate the deference we give to the Board's recommendation." *Kelley*, 3 Wn.3d at 565-66. Instead, we must examine the proportionality of the majority's recommended sanction of disbarment. "When determining if a sanction is proportionate, we look at whether it is 'roughly proportionate to sanctions imposed in similar situations or for analogous levels of culpability.'" *Id.* at 566 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 623, 98 P.3d 444 (2004)). Monro has the burden to show that disbarment is disproportionate. *Id.* He does not meet this burden.

---

[20] Monro complains that the hearing officer "undertook no proportionality analysis" and the Board did not explicitly address proportionality. Appellant's Opening Br. at 78. However, as we recently explained, it is not the hearing officer's role to perform a proportionality analysis, and the Board need not state its reasoning unless "it amends, modifies, or reverses any finding or conclusion or recommendation of the hearing officer." *Monro*, 3 Wn.3d at 741; *Kelley*, 3 Wn.3d at 565 n.14 (citing ELC 11.12(e)).

Monro relies primarily on *In re Disciplinary Proceeding Against Tasker*, which is readily distinguishable. 141 Wn.2d 557, 9 P.3d 822 (2000). The attorney in *Tasker* "commingle[d] funds in his client trust account and pa[id] business and personal expenses out of the commingled account, but without intent to permanently deprive any clients of money." *Id.* at 560. This court declined to impose the presumptive sanction of disbarment, finding extraordinary mitigation due to an unwarranted "delay in the prosecution," during which time "Tasker made the most of the delay by demonstrating his willingness and ability to clean up his act." *Id.* at 567-68. The court concluded that "so substantial was the delay in prosecution, and so compelling [was] Tasker's turnaround . . . disbarment is an inappropriate sanction." *Id.* at 570.

Monro contends that his case is similar because he did not intend to permanently deprive anyone of the funds he wrongfully converted, and he restored the funds prior to his disciplinary hearing. He argues that "[i]f anything, Tasker's RPC violations were worse than those found against Monro" because, according to Monro, his violations were caused by mere "confusion and inattention." Appellant's Opening Br. at 83. To the contrary, as discussed above, we accept the hearing officer's findings that Monro acted knowingly and intentionally in most instances. Moreover, in contrast to *Tasker*, Monro's misconduct occurred over a period of several years and included other serious violations, including dishonesty

to his clients and ODC. *See Tasker*, 141 Wn.2d at 569-70. In addition, the primary mitigating factor in *Tasker* (unwarranted delay in the prosecution) is absent in this case. *See id.* at 567-69. Thus, *Tasker* does not show disbarment is a disproportionate sanction for Monro's serious misconduct.

Monro also attempts to contrast this matter with other cases in which the respondent attorney was disbarred for committing additional misconduct to conceal their initial wrongdoing. *See* Appellant's Opening Br. at 82 (citing *Petersen*, 120 Wn.2d 833; *Johnson*, 114 Wn.2d 737). However, the hearing officer found Monro did precisely that, for example, by providing false information to ODC during its investigation. Monro cites additional cases in which the respondent attorney was *not* disbarred, but many of these cases involved a presumptive sanction of suspension for the most serious misconduct, not disbarment.[21] In other cases, the presumptive disbarment sanction was mitigated by circumstances that are not present here.[22] We conclude that Monro has not met his burden of showing that disbarment is a disproportionate sanction.

---

[21] *In re Disciplinary Proceeding Against Hall*, 180 Wn.2d 821, 834, 329 P.3d 870 (2014); *In re Disciplinary Proceeding Against Holcomb*, 162 Wn.2d 563, 586, 173 P.3d 898 (2007); *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 870-71, 64 P.3d 1226 (2003); *Poole*, 164 Wn.2d at 732; *In re Disciplinary Proceeding Against Heard*, 136 Wn.2d 405, 424, 963 P.2d 818 (1998); *Dann*, 136 Wn.2d at 80; *In re Disciplinary Proceeding Against Johnson*, 118 Wn.2d 693, 703, 826 P.2d 186 (1992).

[22] *Christopher*, 153 Wn.2d at 685 ("remorse was a significant mitigating factor"); *Dynan*, 152 Wn.2d at 621 (dishonest attorney "did not intend to deceive the court, did not intend to benefit himself, and did not receive a direct or indirect benefit from his actions"); *In re*

CONCLUSION

We reaffirm that the "clear preponderance" standard in ELC 10.14(b) properly imposes the intermediate burden of proof in attorney discipline cases and that the hearing officer's decision was adequate for review.  The findings are supported by substantial evidence apart from harmless errors, and the findings of fact support the conclusions of law and the presumptive sanction of disbarment. Because Monro fails to show extraordinary mitigation or disproportionality, we adopt the disbarment recommendation.

---

*Disciplinary Proceeding Against Haskell*, 136 Wn.2d 300, 321, 962 P.2d 813 (1998) (attorney's unusual misconduct had been considered in only one, recent case); *In re Disciplinary Proceeding Against McLendon*, 120 Wn.2d 761, 773, 845 P.2d 1006 (1993) (extraordinary mitigation due to "the existence of bipolar disorder during all relevant times . . . and . . . the abatement of symptoms and misconduct following proper diagnosis and treatment"); *In re Disciplinary Proceeding Against Malone*, 107 Wn.2d 263, 265, 728 P.2d 1029 (1986) (attorney "himself had brought the trust account discrepancies to the attention of the bar association and had 'volunteered in a cooperative manner throughout the audit'"); *In re Disciplinary Proceeding Against Salvesen*, 94 Wn.2d 73, 77-78, 614 P.2d 1264 (1980) (attorney "fully and completely cooperated with the bar in its investigation" and "expressed remorse").

_____
Yu, J.P.T.

WE CONCUR:

_____
Stephens, C.J.

_____

_____
Johnson, J.

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____
González, J.

_____
Mungia, J.

No. 202258-8

GORDON McCLOUD, J. (concurring)—I understand the majority to hold that the "clear preponderance of the evidence" burden of proof applicable in attorney disciplinary cases is substantively identical to the "clear, cogent and convincing" burden of proof applicable in other professional disciplinary contexts. The phrases reflect alternate ways of expressing the constitutionally required intermediate burden of proof, which is more than a mere preponderance and less than beyond a reasonable doubt. Majority at 14-15. As the majority explains, this court has applied that intermediate standard of proof to protect attorneys' due process rights for over 100 years. Majority at 11-12 (quoting *In re Disbarment of Sherrill*, 116 Wash. 143, 147, 198 P. 725 (1921)). Because the majority holds that "clear preponderance of the evidence" is identical to "clear, cogent, and convincing" evidence, and because the majority holds that we will adhere to that constitutionally required standard, I respectfully concur.

Gordon McCloud, J.